In the
United States Court of Appeals
For the Seventh Circuit

Nos.  98-1501, 98-1578, 98-1683, 98-1684,
98-2005, 98-2179, 98-2570

United States of America,

Plaintiff-Appellee,

v.

Frank Smith, Keith McCain, Russell Ellis,
Eric Wilson, Sherman Moore, Steven Pink
and Charles Poteete,

Defendants-Appellants.


Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 95 CR 509--Paul E. Plunkett, Judge.


Argued September 10, 1999--Decided August 17, 2000




   Before Flaum, Chief Judge, and Manion and Diane P.
Wood, Circuit Judges.

   Diane P. Wood, Circuit Judge.  For many years, the
Gangster Disciples (GD) street gang operated a
massive drug distribution business in the Chicago
area. Eventually, the government caught up with
it, and in 1995 the grand jury returned
indictments against different members of the GD
gang. We considered the appeals of other GDs in
United States v. Jackson, 207 F.3d 910 (7th Cir.
2000), and in United States v. Irwin, 149 F.3d
565 (7th Cir. 1998). In the present case, we have
before us the appeals of seven more members from
their convictions and sentences for a variety of
drug, weapons, and money laundering offenses. We
affirm on all counts.

I

   The phrase "street gang" hardly begins to
describe the breadth and complexity of the GD
organization, which began its operations in
Chicago in the early 1970s. Its chairman was
Larry Hoover, for years an inmate of the Vienna
Correctional Center in Vienna, Illinois, and now
an inmate of the maximum security federal prison
known as ADX Florence, in Florence, Colorado.

Next in command was Gregory Shell, who served as Hoover's go-between to GD leaders who were not in prison. As of 1993, the GDs had approximately 6,000 members.

As we have explained elsewhere, see Jackson, 207 F.3d at 913, the GDs were organized along both territorial and hierarchical lines. Below Hoover and Shell and the board of directors were the Governors, each of whom was responsible for a specific geographic territory. The Governors had Assistant Governors, and in addition each Governor had several Regents working under him. Each Regent in turn had several coordinators and soldiers working for him and for whom he was responsible. The number of coordinators and soldiers was referred to as the "count." Defendants Keith McCain ("Khadafi"), Sherman Moore, Eric Wilson ("Fat Eric"), and Russell Ellis ("Poncho") were all Governors; defendants Steven Pink ("Chi Chi") and Charles Poteete were Regents; and defendant Frank Smith ("L'il Frank") collected drug money for Shell and sold cocaine for the group. The GDs as a whole protected their territory from incursions by rival gangs, using violence where necessary. They sometimes used minors, armed with guns provided by the GDs, to provide security and protection for GD leaders and drug dealers.

The GDs had an elaborate code of conduct and set of rules for the internal management of the organization. They enforced these codes through punishments, known as "violations"; they typically spoke of "violating person X." The violations could be as lenient as fines or as stringent as severe physical beatings, depending on the infraction. Gang leaders decided which punishment was appropriate for which misdeed.

The GDs sold drugs throughout Chicago and the surrounding areas. They organized their sales both by territory and through the coordinating efforts of the Governors and the higher gang leadership. The Governors supervised their own territories, ensured that members did not interfere with one another's sales, and kept tabs on rival drug sellers. In addition, the Governors and Regents often served as drug suppliers for their territories. The principal illegal substance involved in the present case was cocaine, and so we often refer simply to cocaine for the sake of simplicity.

Hoover devised a number of ways by which the street profits from cocaine sales worked their way up to the higher levels of the GD organization. First, he developed the system of "nation work." This referred to the obligation of members to devote one day a week to sales for the

GD organization. GD leaders provided members with cocaine to sell on those days and required them to return all receipts to the leaders. As recorded on tapes from prison, see generally Jackson, Hoover estimated that "nation work" would be extremely lucrative, guessing that it would bring in $300,000 per week. Next was the "street tax," under which GDs were required to pay $35 to $75 per week to their leaders on pain of being "violated." The leaders, in turn, had to pay "count" on a weekly basis, which was an amount determined by the number of GDs in the leader's territory. In addition, Regents had to pay $50 to $200 weekly to fund one of the GDs' political organizations, the 21st Century Vote project. Last, GD members were required to buy tickets to concerts sponsored by another ancillary organization, Save the Children.

The government's investigation relied heavily on tape recordings of conversations among high-ranking GD members. We discussed in some detail the recordings made of Hoover and his visitors at Vienna in Jackson. In addition, the government wiretapped June's Shrimp on the Nine, a southside restaurant purchased for Shell by a former gang crimes police officer. GD members occasionally used June's Shrimp as a meeting place. Finally, GD Governor Cedric Parks and GD Board Member Darryl Johnson were wiretapped.

The government also used a document it discovered in the files of Save the Children (which was owned by Hoover's female partner). The document was a list describing the territorial and hierarchical organization of the entire GD operation, and it was known simply as "The List" at the trial. Hoover had mentioned his desire to develop such a document in some of the taped conversations, which he wanted to use to keep track of gang members and their payments to the GDs. "The List" includes all of the defendants here except Wilson.

Before turning to the many arguments raised in this appeal, we review briefly (1) who the players are, (2) what they were accused of doing, and (3) what they were convicted for. We also set forth the charges in the superseding indictment, for ease of reference. (The charges in the original indictment were dismissed on the government's motion.)

A.  Indictment

Count 1:  Operation of drug conspiracy, 21 U.S.C. sec. 846.

Count 2:  Operation of a continuing criminal

enterprise (CCE), 21 U.S.C. sec. 848(a).

Counts 3, 4:  Using minors to further drug conspiracy and to avoid detection, 21 U.S.C. sec. 861(a), 18 U.S.C. sec. 2.

Counts 5-8, 10, 11, 13-17, 28, 38, 39: Possession and distribution of drugs by various individuals, 21 U.S.C. sec. 841(a)(1), 18 U.S.C. sec. 2.

Count 12:  Attempted possession with intent to distribute drugs by conspirators, 21 U.S.C. sec. 846, 18 U.S.C. sec. 2.

Counts 9, 18-27, 29-37:  Using or causing use of telephones to facilitate drug crimes, 21 U.S.C. sec. 843(b), 18 U.S.C. sec. 2.

Count 40:  Using a firearm during a drug trafficking crime, 18 U.S.C. sec. 924(c), 18 U.S.C. sec. 2.

Count 41: Money laundering, 18 U.S.C. sec. 1956(a)(1) (B)(i).


   B.   Defendants, Accusations, and Convictions/1

| Name | Position | Charges | Convictions |
|---|---|---|---|
| McCain | Governor, South East Chicago | Counts 1-40 | Counts 1-8, 11-27, 29, 31-36,39, 40 |
| Moore | Governor, Near West Chicago | Counts 1-40 | Counts 1-7 |
| Ellis | Regent under Moore, later Governor | Counts 1-40 | Counts 1-8, 11-27, 29, 31-36, 39, 40 |
| Wilson | Governor after Ellis | Counts 1-41 | Counts 1-8, 11-27, 29, 31-36, 39-41 |
| Pink | Co-Regent, McCain territory | Counts 1, 7, 10, 14 | Counts 1, 7, 14 |
| Poteete | Regent, Moore territory | Counts 1, 5, 6 | Counts 1, 5, 6 |
| Smith | Collection agent | Counts 1, 17 | Counts 1, 17 |

We have organized our discussion of this complex set of appeals as follows. We consider first the issues raised in the consolidated brief filed on behalf of all defendants; next we consider the individual issues that related to convictions; and finally, we consider the individual sentencing issues.

II

A.  Common Issues

1.  Section 848(b): Offense Element or Sentencing Factor?

Defendants McCain, Moore, Ellis, and Wilson (the Governor defendants) begin with an argument to which the Supreme Court has given significant attention in recent years. Count 2 of the indictment charged all four with engaging in a continuing criminal enterprise in violation of 21 U.S.C. sec. 848(a), which provides in pertinent part as follows:

Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 20 years and which may be up to life imprisonment, to a [specified] fine . . . , and to the forfeiture prescribed in section 853 of this title; except that if any person engaged in such activity after one or more prior convictions of him under this section have become final, he shall be sentenced to a term of imprisonment which may not be less than 30 years and which may be up to life imprisonment, . . . .

The term "continuing criminal enterprise" is defined in sec. 848(c) to apply to a person who commits a drug felony, and that felony is part of a continuing series of such violations that "are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management," and from which the person obtains substantial income or resources.

The statute goes on to prescribe a mandatory term of life imprisonment for a subset of those caught by it. The harsher sentence applies if:

(1) such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and

(2)(A) the violation referred to in subsection

(c)(1) of this section involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title, or (B) the enterprise, or any other enterprise in which the defendant was the principal or one of several principal administrators, organizers, or leaders, received $10 million dollars in gross receipts during any twelve-month period of its existence for the manufacture, importation, or distribution of a substance described in section 841(b)(1)(B) of this title.

21 U.S.C. sec. 848(b).

The question the Governor defendants raise is whether sec. 848(b) defines a separate offense, or if it simply sets out factors that should be used to enhance the sentence imposed for a violation of sec. 848(a). At the time of the trial, this court had never ruled definitively on that question, although we had indicated that sec. 848(b) "appear[ed] to be a sentencing enhancement provision" in United States v. Kramer, 955 F.2d 479, 484 n.4 (7th Cir. 1992). After the trial, we decided in United States v. Hardin, 209 F.3d 652 (7th Cir. 2000), that it was a sentencing factor. Id. at 656-59. The Hardin decision took into account the two pertinent Supreme Court decisions that were available at the time, Almendarez-Torres v. United States, 523 U.S. 224 (1998), and Jones v. United States, 526 U.S. 227 (1999). Since Hardin, however, the Court has issued two more decisions that bear on the subject: Castillo v. United States, 120 S. Ct. 2090 (2000); and Apprendi v. New Jersey, 120 S. Ct. 2348 (2000). We therefore consider it appropriate to revisit the question that was resolved in Hardin, to make sure that nothing in these more recent decisions requires a different result.

As the Supreme Court noted in Apprendi, 120 S. Ct. at 2360, the first time the distinction between "sentencing factors" and elements of an offense appeared in those terms in the Court's decisions was in McMillan v. Pennsylvania, 477 U.S. 79 (1986). McMillan involved the constitutionality of Pennsylvania's Mandatory Minimum Sentencing Act, 42 Pa. Cons. Stat. sec. 9712 (1982). That statute provided that anyone convicted of certain felonies was subject to a mandatory minimum sentence of five years' imprisonment if the sentencing judge found, by a preponderance of the evidence, that the defendant "visibly possessed a firearm" during the commission of the offense. As the Court put it, "[t]he Act operates to divest the judge of discretion to impose any sentence of less than five years for the underlying felony; it does not authorize a sentence in excess of that otherwise

allowed for that offense." 477 U.S. at 81-82. The Court found that Pennsylvania had merely taken one factor traditionally considered by sentencing judges--the instrumentality used to commit the crime--and dictated the precise weight it was to receive. Id. at 89-90. That act alone did not transform what the state legislature plainly regarded as a factor for sentencing into an element of the offense that the Constitution requires to be proved beyond a reasonable doubt before a jury.

The next case in this line, Almendarez-Torres, involved the question whether a provision of the Immigration and Naturalization Act, 8 U.S.C. sec. 1326(b)(2), which authorized a prison term of up to 20 years for an alien who has once been deported, and who then re-enters the United States without special permission, only in those cases where the initial deportation was subsequent to a conviction for commission of an aggravated felony. Otherwise, the authorized prison term was only two years. The Court held that the factor of recidivism that underlay sec. 1326(b)(2) was a traditional sentencing factor and thus (once again) did not have to be proved beyond a reasonable doubt as an element of the offense. It reached this result despite the fact that, unlike McMillan, the additional factor had the effect of increasing the total possible sentence the defendant could receive. 523 U.S. at 243. Three considerations lay behind the Court's thinking: first, recidivism is traditionally taken into account at the sentencing phase; second, the sentencing factor in Almendarez-Torres merely increased the maximum permissive sentence instead of triggering a mandatory minimum term, as in McMillan; and third, the statute's broad permissive range did not create significantly greater unfairness than the due process clause tolerates. Id. at 243-46.

In its very next Term, the Court had occasion to begin defining the limits on the other side of the sentencing factor/element of the offense distinction. The case was Jones v. United States, supra, which presented the question whether the federal carjacking statute, 18 U.S.C. sec. 2119, defined three distinct offenses or a single crime with a choice of three maximum penalties, two of which were dependent on proof of facts that did not need to be present in the indictment or decided by the jury. 526 U.S. at 229. The basic statute provided a fine or imprisonment of not more than 15 years for the offense of carjacking, sec. 2119(1), but if serious bodily injury resulted, the maximum time in prison was 25 years, sec. 2119(2), and if death resulted, the maximum was life imprisonment, sec. 2119(3).

The indictment in Jones's case made no reference to the subsections of the statute, nor did it charge either that the defendant had inflicted serious bodily injury on the victim or death. Only when the presentence report showed up did the factor of serious bodily injury enter the case. The lower courts held that the additional facts that triggered sec. 2119(2) and (3) were nonetheless sentencing factors, but the Supreme Court reversed. It first rejected the idea that "the 'look' of the statute" was a reliable guide to whether the additional facts were elements of the offense or factors for sentencing. 526 U.S. at 233. Next, the Court compared this statute to others and observed that Congress had very frequently (though not always) made serious bodily injury an element of the offense. Id. at 235-36. Finally, invoking the doctrine under which the Court avoids interpretations of statutes that raise constitutional doubts, id. at 239, the Court concluded that serious questions under both the Sixth Amendment and the due process clause would be present if it adopted the "sentencing factor" approach. Id. at 248. It distinguished Almendarez-Torres because of the "distinctive significance of recidivism" as a sentencing factor, noting that "unlike virtually any other consideration used to enlarge the possible penalty for an offense, and certainly unlike the factor before us in this case, a prior conviction must itself have been established through procedures satisfying fair notice, reasonable doubt, and jury trial guarantees." Id. at 249 (emphasis added).

Taking Jones and Almendarez-Torres together, it was unclear how far the Court was prepared to go in characterizing factors other than recidivism as "sentencing factors" rather than elements. Two cases decided during O.T. 1999 cast further light on the subject. First was Castillo v. United States, supra, which involved the question whether 18 U.S.C. sec. 924(c), which prohibits the use or carrying of a "firearm" in relation to a crime of violence, and then imposes a significantly more severe penalty if the weapon is a "machinegun," defines one or two offenses. The Court held that the statute used the term "machinegun" (and like terms) to state an element of a separate offense. 120 S. Ct. at 2091. As such, the indictment had to identify the firearm type and the jury had to find that element proven beyond a reasonable doubt. Id. at 2092. The Court reached its conclusion by looking at the statute's "language, structure, context, history," and other factors throwing light on its objectives. Id. It was important that the maximum penalty for an ordinary weapon was five years, but for a machinegun it was 30 years. On the other hand, the Court specifically rejected the

notion that the fact that sec. 924 as a whole was entitled "Penalties" was significant. Id. at 2093. The kind of traditional sentencing factor to which Almendarez-Torres had referred, the Court stated, "often involve[d] either characteristics of the offender, such as recidivism, or special features of the manner in which a basic crime is carried out (e.g., that the defendant abused a position of trust or brandished a gun)." Id. at 2094.

The latest in this line is the Supreme Court's June 26, 2000, decision in Apprendi. There the Court labeled Almendarez-Torres as "at best an exceptional departure from the historic practice" of entrusting to the jury "the determination of a fact that, if found, exposes the criminal defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." 120 S. Ct. at 2361, 2359. It went on to hold as follows:

Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

Id. at 2362-63. The New Jersey hate crime statute at issue in Apprendi increased the normal 5-10 year range of imprisonment for possession of a firearm for an unlawful purpose to a 10-20 year term, if the defendant acted with a purpose to intimidate an individual or a group because of that person's race, color, gender, handicap, religion, sexual orientation, or ethnicity. Id. at 2351. The doubling of the penalty was enough to make the "purpose to intimidate" an offense element, not a sentencing factor.

With these cases in mind, we must decide whether sec. 848(b) has the kind of "increased punishment" effect that triggers the Apprendi rule. This is a difficult inquiry. On the one hand, sec. 848(a) authorizes a range of imprisonment of 30 years to life, and sec. 848(b) simply eliminates anything in that range below a life sentence for the principal administrator, organizer or leader when the required quantities or value of drugs are involved. Thus, at the time the Governor defendants went to trial, they knew that they faced the risk of a life sentence. On the other hand, as Justice Thomas wrote in his concurring opinion in Apprendi, at a certain level of generality one can surely say that a fact that increases the prosecution's entitlement is an element, not a sentencing factor. Id. at 2379. Ex ante, the expected punishment the defendant will receive is necessarily greater if the range has been shrunk from 30 years to life,

to mandatory life: "The mandatory minimum entitles the government to more than it would otherwise be entitled (5 to 10 years, rather than 0 to 10 and the risk of a sentence below 5). Thus, the fact triggering the mandatory minimum is part of the punishment sought to be inflicted." Id. (internal quotations and citations omitted).

We must decide, therefore, whether the literal fact that these defendants faced at least a risk of a life term is enough to make sec. 848(b) a sentencing statute under Apprendi. Such a decision would, of course, amount to a rejection of the theory of increased expected punishment articulated by Justices Thomas and Scalia in Apprendi--a theory that the other three justices in the majority had no occasion to discuss, given the nature of the New Jersey law actually before them. In the end, however, it is our best guess that the rest of the majority would not have gone this far (and it seems clear that the four dissenters would have no trouble finding a sentencing factor under the circumstances now before us). The language of the principal opinion refers not to the defendant's expected punishment, but to the "prescribed statutory maximum." Id. at 2363. That sounds to us like a reference to the text of the statute, and there is no doubt here that a life sentence was possible under sec. 848(a), even if it was not a certainty.

We agree entirely with Justice Thomas's observation that the predicted sentence would often be lower, if the judge knew she could select a sentence below life. Indeed, we have often remanded cases for resentencing if a district court makes an error in calculating either offense level or criminal history under the Sentencing Guidelines, and (for example) that error has the effect of moving the defendant from level 43 (mandatory life) to level 42 at any criminal history category (360 months to life). See United States v. Patterson, 215 F.3d 776, 786 (7th Cir. 2000); United States v. Guyton, 36 F.3d 655, 661 (7th Cir. 1991). The defendant is entitled in those cases to a chance to persuade the judge to select something less than life, even though the risk of a new life sentence remains. Nevertheless, the Court has reiterated several times that it has not overruled McMillan, and it seems to us that the rationale of McMillan applies with equal force to sec. 848: "[The statute] operates to divest the judge of discretion to impose any sentence of less than [life] for the underlying felony; it does not authorize a sentence in excess of that otherwise allowed for that offense." See 477 U.S. at 81-82. We therefore reject the Governor defendants'

argument that the indictment should have charged that they satisfied the criteria of sec. 848(b) and that the jury should have found those facts beyond a reasonable doubt, and we move on to the other common issues.

2. Jury Instructions: Use of Minor Pinkerton Liability

We review the instructions the district court gave to the jury as a whole. "We reverse only if the jury instructions, viewed as a whole, misguide the jury to the litigant's prejudice." United States v. Rodriguez-Andrade, 62 F.3d 948, 953 (7th Cir. 1995). For example, reversal is proper where the instructions inaccurately state the law, see United States v. Madoch, 149 F.3d 596, 599 (7th Cir. 1998), cert. denied, 526 U.S. 1006 (1999), or fail to present a theory of defense supported by the evidence, see United States v. Minneman, 143 F.3d 274, 280 (7th Cir. 1998). With respect to the instruction regarding the sec. 861 offenses, the defendants' complaint is that the instruction did not require the government to prove that they knew that the individual used was a minor. In fact, the court told the jury that "the Government does not have to prove that the defendant whom you are considering knew that the person was under the age of 18 when he was employed or used to further the narcotics conspiracy."

This was a correct statement of the law, as we have since held in United States v. Frazier, 213 F.3d 409, 419 (7th Cir. 2000). Other circuits had so held before we addressed the issue, in cases such as United States v. Chin, 981 F.2d 1275, 1280 (D.C. Cir. 1992); United States v. Williams, 922 F.2d 737, 738-39 (11th Cir. 1991); United States v. Valencia-Roldan, 893 F.2d 1080, 1083 (9th Cir. 1990); and United States v. Carter, 854 F.2d 1102, 1108-09 (8th Cir. 1988). In Frazier, we joined them, relying on the legislative purpose to protect juveniles, the undesirability of adopting a rule that would encourage drug dealers to blind themselves to the ages of the young people with whom they dealt, and the need to place the burden of ascertaining age on the drug dealer at the time of the transaction. Frazier disposes of this argument entirely.

With respect to the Pinkerton instruction, which relates to the convictions on Counts 3-9, 11-23, 25-27, 29-37, and 39-40, the defendants make a somewhat odd argument. They assert that Pinkerton v. United States, 328 U.S. 640 (1946), is no longer good law in narcotics cases after the Supreme Court's decision in United States v. Shabani, 513 U.S. 10 (1994), which held that

proof of agreement is enough to support a conviction under 21 U.S.C. sec. 846, and that the government does not need to go further and prove that the defendant committed an overt act in furtherance of the conspiracy. But the Court said not a word about Pinkerton in Shabani, and for understandable reasons. The two cases simply dealt with different issues. Except for Count 12, the counts to which the defendants refer charged offenses under 21 U.S.C. sec. 841, not conspiracies under sec. 846. Shabani is about how much the government must prove to show a sec. 846 violation (and we note it does not prohibit the government from proving overt acts--it just says that the government does not bear that burden). Pinkerton is about the ways in which acts of one person may be attributed to another, when there is a conspiracy.

This court has regularly applied Pinkerton to drug conspiracies in post-Shabani cases. See, e.g., United States v. Benjamin, 116 F.3d 1204, 1206 (7th Cir. 1997); United States v. Vega, 72 F.3d 507, 517 (7th Cir. 1995). There is nothing wrong with the Pinkerton instruction given here, which stated that:

A conspirator is responsible for the acts of any other member of the conspiracy if he was a member of the conspiracy when the act was committed, and if the act was committed in furtherance of or as a natural consequence of the conspiracy.

We add that there is no tension between Pinkerton liability and the type of vertical territorial organization that the GDs used for their drug business. The question whether the actions of others were reasonably foreseeable to the particular defendants (or, as this instruction put it, a natural consequence of the conspiracy they joined) is a factual one. Those facts will exist in some hub-and-spokes style conspiracies, especially when the culpability of individuals near the hub is at stake. They are the people who can predict what their counterparts are doing, even if they have no direct knowledge. We are not prepared to hold that Pinkerton liability is unavailable as a matter of law in this kind of case. We therefore reject this line of argument as well.

3.  Richardson Error

After the trial in this case but before oral argument, the Supreme Court decided in Richardson v. United States, 526 U.S. 813 (1999), that a jury in a CCE case must unanimously agree on at least three specific acts that constitute the series of violations called for by sec. 848. As

in Richardson itself, the district court here had not given such an instruction to the jury. The Governor defendants argue that this omission requires reversal of their CCE convictions.

Before addressing that argument directly, we must consider the proper standard of review. The government argues that this kind of problem is subject to harmless error analysis, under Neder v. United States, 527 U.S. 1 (1999), while the defendants predictably both resist that idea and argue that the error here could not be considered harmless. The language of Neder, however, leaves little room for the defendants' position. Neder itself was a case in which the parties agreed that the jury had been given erroneous instructions, in that the issue of materiality had not been submitted to the jury as it should have been under United States v. Gaudin, 515 U.S. 506 (1995). Even so, the Supreme Court held that the harmless error rule of Chapman v. California, 386 U.S. 18 (1967), applied.

The Chapman test, which the Court reconfirmed in Neder, requires us to ask "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" 527 U.S. at 15, quoting from Chapman, 386 U.S. at 24. In this case, as in its companion Jackson, supra, that test is satisfied. In Jackson, other members of the GDs made the same argument under Richardson, based on the same failure of the district court to require the jury to decide on the three predicate offenses. In Jackson, we found harmless error because the jury in fact found the defendants guilty of "many more than three predicate offenses relating to the drug conspiracy." 207 F.3d at 919. The same is true here. McCain, Moore, Ellis, and Wilson were the four defendants that Count 2 charged with violating sec. 848, and the jury convicted all four. It also convicted all four on Counts 3 and 4 (violations of sec. 861, use of minor in connection with drug offenses) and on Counts 5-7 (violations of sec. 841). That assures us that the jury unanimously found that each defendant had committed at least three specific predicate offenses, and that any error here in the instructions was harmless. See also Hardin, 209 F.3d at 659 (finding harmless error in exactly the same circumstances).

4. Sufficiency of Evidence for Life Sentences

This aspect of the Governors' argument attacks the district court's findings at the sentencing phase that established the necessary drug quantities and dollar volumes required to trigger sec. 848(b). As the text we set out earlier

indicates, sec. 848 applies when (1) the person is the principal administrator or one of several principals, and (2) the violation involved at least 300 times the quantity of a substance described in sec. 841(b)(1)(B), or (3) the enterprise received $10 million in gross receipts during any 12-month period of its existence for the manufacture, importation, or distribution of the forbidden substance. Elements (2) and (3) are the ones at issue here.

Once again, the standard of review proves to be critical. The district court's calculations of drug quantity and dollar volume were findings of fact, and thus reviewable only for clear error. United States v. Hach, 162 F.3d 937, 950 (7th Cir. 1998), cert. denied, 526 U.S. 1103 (1999). Even the defendants can do no more than say that the evidence here was "thin," which is a weak start on a difficult argument for them. In specific terms, the government had to show that the principal leaders of the CCE distributed 150 kilograms of cocaine powder or 1.5 kilograms of crack cocaine, and that it received the required revenues.

To do so, it relied on the surveillance tapes in which Hoover was heard discussing the GD drug sales and stating that the GDs as a whole were selling $200,000 to $300,000 a day worth of cocaine. It also relied on the testimony of cooperating witness Akira Stigler that he sold $7,000 to $10,000 of drugs per day in "Pink's Alley," and that each $10 bag contained about 0.1 gram of crack cocaine. The court, adopting the government's estimates, then extrapolated from these figures and concluded that Hoover's estimate led to annual GD sales of up to $109.5 million. Of that, the GD organization itself received its "nation work" cut of one day per week, or a total of $10.4 to $15.6 million annually. Assuming that powder cocaine sells for $20,000 per kilogram (the number suggested in trial testimony), the GDs had to sell 10 to 15 kilos a day to reach Hoover's estimates. Trial witnesses also estimated that a $10 bag of crack contains anywhere from 0.1 to 0.2 gram; taking the average of 0.15 gram, the organization would have had to sell between 3 and 4.5 kilos of crack each day to reach Hoover's estimates. Looking at only the one day per week of "nation sales," there would still be annual sales of 156 to 234 kilos of crack. Using "The List," the court took all these figures and allocated them among the defendants in the same proportion as each defendant's "count" under "The List." For example, McCain had a "count" of 761; he therefore was responsible for 12% of the GD members, and thus 12% of the GD sales.

The defendants attack this methodology on several grounds. First, they urge us to find that Hoover's statements were unreliable because they were nothing but idle boasts. But this was a call for the district court to make, and in light of the rest of the evidence showing the tremendous scope of the GD operations, we cannot say it was clear error to take Hoover seriously. The same is true about the court's assessment of Stigler's credibility. The figures here are so huge that the court would have had to been off by an order of magnitude before any mistake would have made a difference. We see no such error.

5. Other Issues

a.   Batson Claims

The consolidated brief argues that the defendants' right to an impartial jury drawn from a cross-section of the community was violated for three reasons: (1) African-Americans are underrepresented on the Illinois voter registration rolls from which the Northern District of Illinois draws its jurors; (2) the government moved to empanel an anonymous jury, and the court's grant of that motion prejudiced the defendants; and (3) the government used its peremptory challenges in a racially discriminatory way, in violation of Batson v. Kentucky, 476 U.S. 79 (1986).

We find no merit to any of these arguments. We have found before that there is nothing wrong with the use of voter rolls to select a venire. United States v. Cooke, 110 F.3d 1288, 1302 (7th Cir. 1997). Furthermore, the 109-person venire in this case included 15 African-Americans, or 13.8% of the members. Counsel for Moore pointed out that the voter rolls show that 18% of the relevant population is African-American, but the 4.2% difference is hardly worth noting when one considers the effect of random selection of venires. The thrust of the defendants' argument on the anonymity of the jury was to support their Batson argument. In any event, this is a decision that lies within the district court's discretion, United States v. DiDomenico, 78 F.3d 294, 301-02 (7th Cir. 1996), and there is nothing here that persuades us the district court abused its discretion or impermissibly communicated to the jury that the defendants were likely to be personally dangerous to it. Cf. United States v. Smith, 31 F.3d 469, 471-72 (7th Cir. 1994).

In all, the government exercised five peremptory challenges during the jury selection process. Three were against African-Americans, and the other two were not. The final jury included two

African-Americans. Following the guidance from Batson, the district court required the government to articulate its reasons for striking each of the African-American venire persons. See United States v. Cooper, 19 F.3d 1154, 1160-61 (7th Cir. 1994). The government explained that Juror No. 49 lived in the "territory" of some of the defendants, her brother had been prosecuted for drugs, and the government attorneys found her manner "stand-offish." Juror No. 116, it said, was a "social worker type," who it believed would be too sympathetic toward the defendants. It was troubled by Juror No. 129 because on the one hand she disavowed all knowledge of Larry Hoover, but on the other hand she acknowledged reading magazines that had published several articles about Hoover; in addition, her brother and Poteete were both hair dressers. The district court accepted these reasons and found that they were nondiscriminatory. A finding on the question of discriminatory intent is entitled to deferential review. See, e.g., United States v. Brisk, 171 F.3d 514, 523 (7th Cir.), cert. denied, 120 S. Ct. 150 (1999); Mahaffey v. Page, 162 F.3d 481, 484 (7th Cir. 1998), cert. denied, 526 U.S. 1127 (1999). We find no such error here; to the contrary, the government provided multiple nondiscriminatory reasons for its strikes, and the record contains no support for the defendants' various efforts to suggest that the government was somehow systematically disadvantaging the African-American panel members.

   b.   Admission of "The List" into Evidence

   The defendants all complain that the district court should not have admitted "The List" into evidence. We review that decision only for abuse of discretion. United States v. Curry, 79 F.3d 1489, 1494-95 (7th Cir. 1996); United States v. De Gudino, 722 F.2d 1351, 1355 (7th Cir. 1984). "The List" was the document that IRS agents seized from a file cabinet at Save the Children Promotions. The folder containing "The List" was marked "L./Sr," presumably to distinguish it somehow from Hoover's son, Larry Hoover, Jr. The information on "The List" described the hierarchical and territorial organization of the GDs.

   The defendants complain that it was not properly admitted as a co-conspirator statement under Fed. R. Evid. 801(d)(2)(E), because the identity of the person who created it was unknown. They also assert that it was not properly authenticated under Fed. R. Evid. 901. Neither argument holds water.

The details contained in "The List" were such that it could only have been written by a member of the GDs or by someone sufficiently involved with the business to be intimately familiar with it--in other words, by a co-conspirator. The defendants are wrong to suggest that it is necessary to know the precise identity of a co-conspirator before statements can be admitted under Rule 801(d)(2)(E). See, e.g., De Gudino, 722 F.2d at 1355-56. As for authentication, the magistrate judge concluded that there was ample proof of its authenticity: there were recordings of Hoover and Shell discussing its creation, it was discovered in the files of Hoover's female companion, the label on the file matched Hoover's name, and the contents clearly indicated that it was a GD document. These are the kinds of factors to which Illustration (b)(4) of Rule 901 refers. The district court did not abuse its discretion in admitting "The List."

### c.  Singleton Claim

We have by now on numerous occasions rejected the argument that criminal convictions must be reversed whenever the government has promised its witnesses leniency in exchange for their testimony. See United States v. Turner, 203 F.3d 1010, 1014 (7th Cir. 2000); United States v. Curry, 187 F.3d 762, 765-66 (7th Cir. 1999), cert. denied, 120 S. Ct. 834 (2000); United States v. Condon, 170 F.3d 687, 688 (7th Cir.), cert. denied, 526 U.S. 1126 (1999). It has no merit here either, and we have nothing to add to our earlier decisions on the point.

### B.  Individual Issues: Convictions

Before beginning our consideration of the individual issues the different defendants have raised, we note that defendants Poteete and Smith did not file supplemental individual briefs, choosing instead to rely on the points raised in the joint brief. We therefore have the individual claims of only five of the defendants to consider.

### 1. Moore

### a.  Sufficiency of Indictment, sec. 861

We begin with Moore's pro se challenge to the language of the indictment charging him with using minors to commit or avoid detection of a drug felony, in violation of 21 U.S.C. sec. 861. (Ellis moved pro se to join this argument; the panel took that motion with the case, and we

hereby grant it.) The relevant parts of that statute read as follows:

(a)  Unlawful acts

  It shall be unlawful for any person at least eighteen years of age to knowingly and intentionally--

(1)  employ, hire, use, persuade, induce, entice, or coerce, a person under eighteen years of age to violate any provision of this subchapter or subchapter II of this chapter;

(2)  employ, hire, use, persuade, induce, entice, or coerce, a person under eighteen years of age to assist in avoiding detection or apprehension for any offense of this subchapter or subchapter II of this chapter by any Federal, State, or local law enforcement official; . . .

(Emphasis added.) As Moore correctly points out, Count 3 of the superseding indictment alleged only that from 1987 through August 30, 1995, in Chicago and elsewhere within the Northern District of Illinois, defendants McCain, Moore, Vincent Martin, Ellis, Tirenzy Wilson, and Eric Wilson "employed, hired, used, induced and enticed a person under eighteen years of age to violate Title 21, United States Code, Section 846, as charged in Count One of this Indictment," in violation of 21 U.S.C. sec. 861(a)(1) and 18 U.S.C. sec. 2. It never mentions doing these acts "knowingly and intentionally," as the statute appears to require. The same flaw exists in Count 4, which charges a violation of sec. 861(a)(2) (use of minor to avoid detection of drug crime).

  Moore makes his attack on the sufficiency of the indictment for the first time on appeal. On the one hand, it is clear that he is entitled to do so, for Fed. R. Crim. P. 12(b)(2) states that a defendant may raise at any time an objection that the indictment "fails to show jurisdiction or to charge an offense," and such an objection "shall be noticed by the court at any time during the pendency of the proceedings." Here, Moore is arguing that the indictment's failure to allege that he took these acts "knowingly and intentionally" means that it fails to charge an offense. On the other hand, the untimely nature of Moore's objection affects the standard of review that we use. If an indictment has not been challenged in the trial court, it is immune from attack "unless it is so obviously defective as not to charge the offense by any reasonable construction." United States v. Wabaunsee, 528 F.2d 1, 2 (7th Cir. 1975), quoting United States v. Vanderberg, 358 F.2d 6, 10 (7th Cir. 1966); see also United States v. Johnson, 805 F.2d 753,

758 (7th Cir. 1986) (same).

While this indictment was far from perfect, and it might have been vulnerable to a timely objection, we conclude that it is not so thoroughly defective that it must be set aside at this late date. In so holding, we recognize that "in order for an indictment to be valid it must allege all of the elements which are necessary to constitute a violation of the statute." Davis v. United States, 253 F.2d 24, 25 (6th Cir. 1958), quoted in Wabaunsee, 528 F.2d at 3. It is not necessary to spell out each element, but each element must be present in context. See United States v. Olson, 846 F.2d 1103, 1115-16 (7th Cir. 1988).

Moore (and Ellis) rely on Wabaunsee in their effort to urge the opposite result. Wabaunsee, however, held only that a defect in an indictment could not be cured by a mere citation to the governing statute or by proper jury instructions. We do not disagree with those propositions, but we do not find them particularly useful here either. The government responds by pointing to United States v. Dixon, 596 F.2d 178 (7th Cir. 1979), in which the defendants were charged with violating the statute that prohibits conveying a weapon within a penal institution (in Dixon's case, a "shank," or sharpened table knife). In that case, the statute did not contain an express scienter requirement, but courts had inferred that such a requirement existed. The indictment tracked the language of the statute. This court found the indictment sufficient for two reasons: first, because it would be unlikely that a person would unknowingly carry a weapon around in a penal institution, and thus the acts charged implicitly included a knowledge requirement (and would have permitted the defendant to raise as a defense the possibility that he was an unwitting carrier); and second, because it was sufficient for the indictment to trace the language of the statute. Id. at 180-81.

Our case differs from Dixon at least on the latter point, because Counts 3 and 4 most definitely did not include the statutory words "knowingly and intentionally." The first point, however, is more useful. As we held in United States v. Garcia-Geronimo, 663 F.2d 738 (7th Cir. 1981), "[i]n determining whether an essential element of the crime has been omitted from the indictment, courts will not insist that any particular word or phrase be used." Id. at 742. In Garcia-Geronimo, we held that the use of the phrase "dispose of" under 18 U.S.C. sec. 1426(b) meant "to direct or assign for an illegal use," and thus made criminal intent an element of the offense. Id. at 743. The use of the term "dispose

of" in the indictment was thus sufficient for charging intent, bearing in mind the fact that the criminal intent element may be alleged in any form that substantially states it. Id. at 742-43.

We agree with Moore that some of the actions charged in Counts 3 and 4 might not necessarily imply a knowing and intentional act. Perhaps one might "employ," "hire," or "use" a person to violate the controlled substance laws or to assist in avoiding detection without criminal intent (though we find it unnecessary to resolve this question). But it seems to us impossible to take the next step, which is to "induce" or "entice" a person to take those actions, without the necessary scienter. The ideas of purpose, knowledge, and intent are inherent in those words. We are therefore satisfied that this is not one of those cases in which the indictment is "so obviously defective as not to charge the offense by any reasonable construction," and we therefore reject Moore's and Ellis's argument that Counts 3 and 4 (and others they say are dependent on them) must be dismissed.

b.  Sufficiency of Evidence: sec.sec. 848, 861

(1)  CCE conviction, sec. 848.  Moore next argues that the evidence was insufficient to support his convictions under the CCE statute, sec. 848, and under the statute prohibiting the use of a minor, sec. 861. We disagree with the government that Moore (and Wilson) waived or forfeited this argument; their motions under Fed. R. Crim. P. 29(c) for judgment or acquittal or new trial, while a bit on the general side, were enough to preserve the argument. United States v. South, 28 F.3d 619, 623 (7th Cir. 1994).

Specifically, Moore argues that (1) there was no direct evidence that he was engaged personally or indirectly as a supervisor in three or more illicit transactions, and that his convictions for the predicate offenses were based solely on the liability theory recognized by Pinkerton, supra; (2) the government proved only that three of the Regents working under him were involved in drug sales and transactions, and thus his conviction may rest impermissibly on the inclusion of innocent supervisees; and (3) the court erred in refusing to instruct the jury on Moore's defense that he had withdrawn from the conspiracy.

We see no merit in the latter two points. Moore is wrong to assume that his CCE conviction could rest only on his supervision of five of the eight people the government named as his subordinates.

On this record, the jury easily could have found that he acted in concert with numerous individuals. Evidence in the record showed that the GDs were a huge organization, that he was a GD Governor, that GD Governors had several hundred subordinates, and that many of those subordinates were involved in drug trafficking. That offers ample support for the jury's verdict. As for withdrawal, Moore underestimates the instructions the court did give. Under those instructions, the jury was told that it could consider "evidence [of Moore's demotion from Governor] as it bears on [Moore's] liability for the acts of the conspiracy committed after that time." The substantive counts on which the jury convicted Moore (5, 6, and 7) all refer to conduct from 1993, which was before Moore's early 1994 demotion.

As we recently had occasion to reiterate, under Pinkerton "a coconspirator may be held criminally liable for the foreseeable overt acts of others in furtherance of a conspiracy." United States v. Frazier, 213 F.3d 409, 416 (7th Cir. 2000). The theory rests essentially on agency concepts. Before Pinkerton can be applied, it is of course necessary to show that a conspiracy existed, that the defendant joined the conspiracy, that the other actor was also part of the conspiracy, and that the overt act was both foreseeable and in furtherance of the conspiracy. At that point, however, like the Three Musketeers, it's all for one and one for all. It is possible that a low-level street dealer might not be able to foresee all of the actions of the ringleaders of the conspiracy, and that people out on different "spokes" of the conspiratorial wheel might similarly be unaware of the role others are playing. As applied to Moore, however, these concerns do not arise. Pinkerton liability applies in general to conspiracies and CCEs, United States v. Graewe, 774 F.2d 106, 108 (6th Cir. 1985), and the record showed countless overt acts of other members of the GDs that were foreseeable to Moore and that were in furtherance of the enterprise.

(2) Use of minor convictions, sec. 861. As an evidentiary matter, Moore argues that there was no evidence that any of the defendants had personally employed or used a minor to carry out drug activities, that there was no evidence that a minor worked in his territory, and that his conviction was based solely on an impermissible theory of global responsibility (i.e. that he was guilty because he was a GD and because the GDs often used minors to sell drugs). Even the government points to no evidence indicating that Moore personally used minors in the forbidden ways. It argues instead that the GD drug

conspiracy did so regularly. Robert Crawford, for example, joined the GDs when he was 12 years old and was selling drugs by the time he was 16. Vincent Martin, Moore's assistant governor, used minors to cover his drug spots. The GDs liked to use minors for a variety of purposes (including also providing security for the leaders) because they knew or believed that minors would be treated more leniently by law enforcement authorities if they were caught. We agree with the government that this is enough to show at least vicarious liability for the use of the minors. See United States v. Davis, 154 F.3d 772, 786 (8th Cir. 1998), cert. denied, 525 U.S. 1169 (1999). The jury reasonably could infer that Moore, as a high official in the organization, knew about this use in general, that it was reasonably foreseeable to him, and that it assisted the enterprise.

c. Motion for Severance

Before the trial, Moore moved unsuccessfully to have his trial severed from that of Poteete. We review the denial of such a motion for abuse of discretion. Zafiro v. United States, 506 U.S. 534, 541 (1993). Under Fed. R. Crim. P. 8(b), multiple defendants may be tried together if they participated in the same transactions constituting the offense. On the other hand, Fed. R. Crim. P. 14 provides that if a defendant will be prejudiced by joinder of offenses or defendants, the court may grant a severance. Moore tried to show prejudice from the joinder of his case with Poteete's in two ways: first, he claimed that Poteete's defense was inconsistent with Moore's innocence, and second, the joint trial meant that Moore would be unable to confront Poteete, in violation of his Sixth Amendment rights.

One of Moore's defenses at trial was that he withdrew from the conspiracy after he was stripped of his rank of Governor for brutally violating (i.e. punishing) Poteete, who was then one of his Regents. As part of his defense, Moore wanted to call Poteete to the stand to testify that the violation never occurred. Poteete, however, was defending himself on the ground that Moore coerced him into joining the GD organization, in part through the physical beating. These circumstances do not show that the district court abused its discretion. Indeed, Moore's defense is not really antagonistic to Poteete's. It was possible for the jury to believe both that Moore coerced Poteete into joining the GDs and that Moore later withdrew. And in any event, even if there was some residual inconsistency in the defenses, Zafiro holds that

"[m]utually antagonistic defenses are not prejudicial per se." 506 U.S. at 538. Finally, Moore has not shown that the denial of the severance motion caused him to suffer actual prejudice. He never showed that Poteete would have testified at a separate trial (as he might have done with an affidavit from Poteete), or that he would have testified that Moore did not beat him.

### d. Use of Perjured Testimony

Moore argues that Stigler perjured himself about the time when he was selling drugs for Pink. He moved for a new trial on that basis, but the district court denied his motion. We review this decision for abuse of discretion. United States v. Saadeh, 61 F.3d 510, 523 (7th Cir. 1995). The alleged perjury was as follows. At the trial, Stigler (a former GD member) testified about the drug selling activities in a location known as "Pink's Alley," on 82nd Street in Chicago. Stigler said that he began selling drugs there two months after he and his family moved to 81st Street and Ellis Avenue. At the trial, Stigler said that the move took place at the beginning of 1993. Records from the Cook County Department of Corrections, however, show that Stigler was incarcerated there from November 30, 1992, to February 19, 1993. A rap sheet from the Chicago Police Department (CPD) further showed that Stigler was arrested again on March 1, 1993, and re-entered Cook County custody on March 3, 1993, where he stayed until May 28th. Even then, he was not released; instead he was turned over to the Illinois Department of Corrections, in whose care he remained until November 23, 1993.

These dates, Moore argues, show that Stigler must have perjured himself when he testified that he started selling drugs for Pink two months after the beginning of 1993. His testimony detailed exactly the way these sales occurred. Moore argues in addition that the government must have known about this perjury, because it had access to the various rap sheets and incarceration records that would have proven it.

We do not dispute the fact that Stigler's testimony may have been inaccurate, but that does not necessarily make it perjured, and even if he was lying, it does not necessarily show that the government knew this. He could have mixed up his dates, for example. The government notes that when he was arrested in November 1992, he gave as his address 82nd and Ellis, indicating that the move may have been sooner than he estimated. In addition, it is clear that he was twice arrested selling drugs in or near "Pink's Alley." (The

government has conceded that one of those arrests was approximately two blocks away, not right at the mouth of the alley, but we agree that this discrepancy is inconsequential.) Finally, there was enough independent evidence corroborating Stigler's testimony that the district court was entitled to conclude either that it was not perjured or, at the very least, the government would have had no reason to think it was perjured. That is enough, under Saadeh, to reject this claim. See 61 F.3d at 523.


2. McCain

a. Motion to Suppress

Although the government argues that McCain failed to object to the magistrate judge's ruling on his motion to suppress, our examination of the record indicates that he did file an objection (although the document itself is not here). Rather than tarry on that point, we will consider the merits of his challenge to the court's denial of the motion.

McCain was arrested on June 4, 1991, by officers from the CPD. He claims that they lacked probable cause to arrest him then, and thus that his statements following that arrest should have been suppressed. Testimony from a CPD officer indicated that on June 4, he and other CPD officers traveling in an unmarked squad car saw a group of four men standing in a driveway near a building. They knew the building was a gang members' gathering place, and they recognized one of the men to be a gang member. They pulled into the driveway, at which point McCain and three other men dropped some ammunition to the ground and tried to leave. All four were then arrested for illegal possession of ammunition. The officer testified that McCain was twice given his Miranda warnings, once at the time of arrest and later at the stationhouse. McCain contradicted this statement, but the district court chose to credit the officer's statement. We see no reversible error in this decision; it was up to the court to decide whom to believe, and if the officer's account was true, there was plenty of probable cause for the arrest.

Second, McCain complains that certain telephone calls he made were improperly intercepted. The court signed and issued a 30-day interception order on July 6, 1994; that order was extended on August 16, 1994, for another 30 days. The extension was to end on September 14, 1994, at 12:25 p.m. The government agents shut down the wiretap on September 15 at 12:00 p.m., and then they applied for and received another 30-day

extension. The court signed that extension at 4:49 p.m., and the first call under it was intercepted that day at 4:57 p.m. The calls about which McCain is now complaining were intercepted between 11:29 a.m. and 12:06 p.m. on October 15, 1994, the last day of this extension period.

His argument is meritless in light of the language of the federal wiretap statute, which provides that the "thirty-day period begins on the earlier of the day on which the investigative or law enforcement officer first begins to conduct an interception under the order or ten days after the order is entered. . . ." 18 U.S.C. sec. 2518(5). According to the statute, the 30-day period for the extension began to run on September 15, 1994--the day of the first interception. We think it most sensible to look to Fed. R. Crim. P. 45(a) for guidance on the way the statutory time period should be computed. See, e.g., United States v. Sklaroff, 323 F.Supp. 296, 317 (S.D. Fla. 1971). Under that approach, the first day of the 30-day period is not included but the last is, and the order in this case expired on October 15. Although one district court has chosen not to apply Fed. R. Crim. P. 45(a) to the calculation of the 30-day period, see United States v. Gangi, 33 F.Supp.2d 303, 309 (S.D. N.Y. 1999) (not applying Fed. R. Crim. P. 45(a) and including both first and last day in calculation of 30-day period), the Third Circuit interpreted the system in the same way we have done. See United States v. Carson, 969 F.2d 1480, 1485 (3d Cir. 1992). We see no reason to create a circuit conflict over this kind of mechanical determination, especially when the general methodology of the Rule is familiar (though we note that we are not applying Rule 45 directly, and thus that we are not necessarily incorporating all of its details such as the way to count weekends and holidays). The telephone calls about which McCain is complaining were intercepted within that time period, and so they could be used in accordance with the statute.

Last, McCain argues that because the wiretap was illegal, his arrest on October 15, 1994, was also unsupported by probable cause (because the arrest was based on information collected during the wiretap). Because we have found no problem with the wiretap, this argument falls with that one.

   b.  Sufficiency of Evidence, sec. 848

McCain's argument on this point, to the extent that it differs from Moore's, asserts only that the jury should not have believed the trial testimony of certain witnesses (Robert Crawford,

Christopher Robinson, and McKinley Hayden, in particular). He also implies that it is significant that he never personally visited Larry Hoover at the Vienna Correctional Center. The latter fact is irrelevant, and the former argument asks us to re-do the jury's job. That is not our function. United States v. Johnson-Dix, 54 F.3d 1295, 1306 (7th Cir. 1995). There was ample evidence to support McCain's guilt under sec. 848.


   3.Ellis

     a.  Admission of Ellis's Statements
   Ellis's motion to suppress concerned statements he made while he was under arrest on December 7, 1994. A magistrate judge held a hearing on the motion and recommended that the statements should be admitted; the district court agreed after reviewing the transcript of the hearing and the report and recommendation. The dispute centers around the question whether Ellis received proper Miranda warnings when he was arrested on that date at the time of his arrest and when he arrived at the police station. Ellis concedes that he received written warnings later, when he was taken to the office of the United States Attorney; there he signed a waiver and agreed to become a cooperating witness (though he later retracted that agreement).

   This was a simple conflict in testimony that the court resolved in favor of the police. The officers testified that they administered oral warnings, and Ellis denied that he did and claimed that he asked to speak to an attorney and was refused. Ellis also made a general allegation of coercion. We agree with Ellis that some of the reasons the magistrate judge offered for believing the officers were not particularly persuasive: the judge thought that the officers would never have jeopardized such an important investigation by being careless with Miranda, and the judge also found it odd that Ellis waited a year before executing his affidavit containing the allegations of misconduct. The time lag is easily explained, because Ellis was not arraigned until November 21, 1995, and his affidavit followed very shortly thereafter; the presumption about police behavior we find troubling, but in the end not enough to amount to reversible error. The most important point was that the magistrate chose to believe the testimony of the officers. The district court had the full transcript of that testimony before it, and it was able to assess both accounts on its own. The magistrate judge's remark about the attention the officers were probably paying to the investigation is not enough to require reversal on this factual issue.

b.   Sufficiency of Evidence: sec.sec. 848, 861

   Ellis's arguments on these points track those of Moore, and we reject them for the same reasons.


   4.Wilson

   a. Sufficiency of Evidence: sec.sec. 848, 861, 18 U.S.C. sec. 1956

   Wilson's arguments challenging the sufficiency of the evidence to support his convictions under the CCE statute, sec. 848, and under the minors statute, sec. 861, also founder on the same grounds as the same points did with Moore. Wilson also claims that the evidence was insufficient to support his conviction on Count 41 for money laundering, in violation of 18 U.S.C. sec. 1956(a)(1)(B)(i). This subsection required the government to prove that (1) the defendant knew that the transaction involved the proceeds of unlawful activities, and (2) that the transaction was designed to conceal the unlawful nature of the proceeds. See United States v. Jackson, 983 F.2d 757, 765 (7th Cir. 1993); see also United States v. Griffin, 84 F.3d 912, 926-27 (7th Cir. 1996). The funds laundered need not be traceable to a specific illegal transaction; it is enough if the government shows that the transaction involved some funds which were derived from some illegal activity. See United States v. Jackson, 935 F.2d 832, 840 (7th Cir. 1991).

   The government presented the following evidence at trial: (1) a 1994 Chevrolet Astro Van was purchased under the name of Wilson's brother-in-law; the brother-in-law paid $2,500 cash down and financed the rest with a loan for $31,000 from the First National Bank, using a loan application with fraudulent information on it; (2) Wilson's brother-in-law lived in the same household with the defendant; (3) Wilson often used the van; (4) Wilson had over $12,000 in stereo equipment installed in the van; and (5) payments on the car loan and stereo equipment were all made with cash or money orders.

   The standard of review that applies to sufficiency challenges to jury verdicts dooms Wilson's argument. We would have to find that no rational jury could have seen the evidence as this one did, taking all the evidence in the light most favorable to the government and drawing all permissible inferences in its favor. United States v. Shorter, 54 F.3d 1248, 1254 (7th

Cir. 1995); United States v. FJ Vollmer & Co., Inc., 1 F.3d 1511, 1519 (7th Cir. 1993). At the time Wilson was promoted to Governor in 1994, he commented that he just wanted to make a quick $100,000. This was right around the time when he bought the van. Witnesses testified that Wilson personally bought and sold drugs, so the jury knew that he had illegal cash sloshing around that could have been used. In addition, the false information on the loan application permitted the jury to infer that Wilson had something to hide about the source of the funds he was going to use for his payments.

No one would call this evidence overwhelming, but that is not the standard the government must meet once the jury has come to its decision. The circumstantial evidence here could legitimately have been interpreted by the jury to show money laundering, and we therefore reject Wilson's challenge to his conviction on Count 41.

5. Pink

a.   Use of Perjured Testimony

We have already considered this point in connection with Moore's challenge to the Stigler testimony. Moore and Pink essentially briefed the issue together, with most of the detail appearing in Pink's brief. For the reasons stated in our discussion of Moore's point, we find that Pink cannot prevail on this issue either.

b.   Ineffective Assistance of Counsel

Pink's brief includes the argument that he received constitutionally ineffective assistance of trial counsel, because his lawyer did not identify the inconsistency in the dates between Stigler's rap sheet and his trial testimony. Pink alleges that this oversight fell below an objective standard of reasonableness and was prejudicial to him, as required by Strickland v. Washington, 466 U.S. 668 (1984). He develops this point, however, in a cursory two-page discussion in his brief, most of which is devoted to a description of what happened. We find this insufficient to raise the point for direct review and thus we decline to reach the issue. We note as well that it is almost always undesirable to try to raise effectiveness of counsel on direct appeal, because the record normally needs the kind of supplementation that can only occur in a proceeding under 28 U.S.C. sec. 2255. See McCleese v. United States, 75 F.3d 1174, 1178 (7th Cir. 1996).

III

Last, we address the remaining sentencing issues raised by the individual defendants. (We say "remaining" because the question whether sec. 848 sets forth sentencing factors or elements of two offenses logically might belong here too.)

A.  Moore

Moore reprises the perjured testimony argument we have already discussed with respect to his conviction in Part II.B.1.d., this time to challenge his sentence. For the same reasons we declined to find that Stigler's testimony infected the jury's verdict, we find that it did not infect the findings that formed the basis of Moore's sentence.

B.  McCain

McCain raises two sentencing points specific to his case. The first we can dispose of in a sentence: he claims that U.S.S.G. sec. 2D1.1 violates his guarantee to equal protection because of the 100:1 ratio it uses for crack cocaine. This claim is meritless under our decisions in United States v. Westbrook, 125 F.3d 996, 1010 n.16 (7th Cir. 1997), and United States v. Booker, 73 F.3d 706, 710 (7th Cir. 1996) (per curiam), to name just a few. The second concerns the evidence that supported the drug quantities that were attributed to him individually. He complains that the court should not have given him an offense level of 38 for Guidelines purposes, because (1) Crawford's testimony was unreliable and contradicted some things he said at Hoover's trial, and (2) Hoover and Shell controlled "Pink's Alley," and thus the court should not have attributed those sales to him. The former was a credibility call, however, and the latter overlooks the fact that "Pink's Alley" was within McCain's territory. There was no reversible error in McCain's sentencing.

C.  Ellis

We have already considered part of Ellis's (and the others') arguments that the evidence was not sufficient to support the mandatory life sentence required by sec. 848(b). He also asserts that the evidence showed neither that he was a principal administrator, organizer or leader, nor that his drug sales resulted in an offense level of 36-38. There was ample evidence, however, to show that he was a Governor, and we ruled in Jackson that Governors count as principal actors even though

Hoover and the Board of Directors were above them. See 207 F.3d at 919-20. The logic of Jackson, even if not all of its details, applies here as well to this part of sec. 848(b), and Jackson directly governs his argument under U.S.S.G. sec. 3B1.1.

As for the amount of drug sales, while we would have preferred more detailed findings from the district court explaining how it reached the calculations it did (which gave Ellis a total offense level of 43 on the substantive counts), we are satisfied that the record as a whole supports these findings. The relevant conduct guideline, U.S.S.G. sec. 1B1.3(a)(1), requires the court to take into account not only the defendant's personal conduct, but all other quantities of contraband that were reasonably foreseeable to him that were within the scope of the joint criminal activity. Id., Application Note 2. The district court knew this, it knew what was reasonably foreseeable to the Governors, and it knew how large the operations were. This finding too can stand.

Last, Ellis says that the court should have given him a criminal history category of I instead of a II. At offense level 43, the criminal history category makes no difference anyway, because all history levels carry the same Guideline sentence of life in prison. In addition, Ellis's argument is based on the fact that one of his criminal history points was based on an aggravated assault charge for which he received six months' supervision. He claims that the record does not show that he pleaded guilty to the charge, and thus that his supervision was based on something less than an admission or adjudication of guilt. We think he is probably splitting hairs, because Illinois permits supervision either on a formal plea of guilty or a "stipulation by the defendant of the facts supporting the charge," as well as upon a finding of guilt. 730 ILCS 5/5-6-1(c). The stipulation option appears to be at least as conclusive as a plea of nolo contendere, however, and those pleas are enough to show conviction of an offense for purposes of U.S.S.G. sec. 4A1.2(a). In any event, because the point made no difference to his sentence, any error the court may have committed was harmless.


   D.  Pink

Pink makes three arguments about his sentence, in which he challenges (1) the enhancement he received for use of a gun under U.S.S.G. sec. 2D1.1(b)(1); (2) the leadership enhancement he received under U.S.S.G. sec. 3B1.1(b); and (3)

his criminal history calculation. Accepting his first argument would require us to find that it was not reasonably foreseeable to him that guns were being used in the GD conspiracy. With all respect, such a finding would be impossible to make, even without taking into account the fact that this is another issue we review only for clear error. See United States v. Taylor, 111 F.3d 56, 59 (7th Cir. 1997). With respect to the second argument, Pink asserts that the judge should have made specific findings about which participants were under his supervision. What the court said instead, referring to "Pink's Alley," was "That alley was running full blast with people all over it and they were working for him, and, however we get there, there's ample evidence to say five." The evidence supports the court's observation. Furthermore, sec. 3B1.1 also permits the three-level increase if the defendant "exercised management responsibility over the property, assets, or activities of a criminal organization." Id., Application Note 2. Pink managed "Pink's Alley" and thus qualified in this way for the enhancement as well.

Last, Pink was assigned two criminal history points for two separate 1984 state charges for felony possession with intent to distribute marijuana. Pink says that these convictions were part of the same GD drug distribution conspiracy at issue here. He notes that the GD conspiracy allegedly began in the early 1970s, that the GDs controlled the neighborhood where Pink committed the earlier crimes, and that Pink was even then in their "grasp." The government responds that there is no evidence that Pink joined the GDs before 1990 or so, that there is no evidence that the earlier crimes took place in the same geographical area as his crimes here, and that the marijuana convictions were part of the same plan as the GD conspiracy. The district court was entitled to take the government's view of the evidence here. Indeed, Pink does not squarely admit that he was a GD at the earlier time, undoubtedly for good reason.

IV

In the end, therefore, we find no merit in any of the arguments any of the defendants have raised. This was a complex proceeding for all concerned: the prosecutors, defense counsel, the district court, and now us. We commend the lawyers who were appointed to represent these defendants for their vigorous efforts to do so. For the reasons stated, however, we Affirm the convictions and sentences of all seven appellants.

/1 Counts 10, 28, and 38 were dismissed on the government's motion before trial. Convictions on Count 1 were dismissed after the jury rendered its verdict, as conspiracy is a lesser included offense of the continuing criminal enterprise.