In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 00-2837, 00-3017, 00-3070, and 00-3514

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JOSE SOUFFRONT, also known as BAM BAM,
JORGE MARTINEZ, also known as DANNY,
also known as CHICO, GUSTAVO COLON, also
known as EL MAGNATE, also known as BOSS,
also known as GINO, also known as LORD GINO,
also known as JEFE, and MARISOL COLON,
also known as MARI,

*Defendants-Appellants*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 659—**Wayne R. Andersen**, *Judge*.

ARGUED JANUARY 9, 2001—DECIDED AUGUST 6, 2003

Before FLAUM, *Chief Judge*, HARLINGTON WOOD, JR. and
EASTERBROOK, *Circuit Judges*.

HARLINGTON WOOD, JR., *Circuit Judge*. Fourteen members of the Latin Kings street gang, including the four above-named defendants, were indicted on numerous drug-related offenses, including conspiracy with intent to distribute cocaine, heroin, and marijuana under 21 U.S.C.

§ 846, engaging in a continuing criminal enterprise ("CCE") under 21 U.S.C. § 848(a), knowingly and intentionally using a telephone in causing and facilitating the commission of a felony under 21 U.S.C. § 843(b), distributing cocaine under 21 U.S.C. § 841(a)(1), and attempting to distribute cocaine in violation of 21 U.S.C. § 846. Jose Souffront ("Souffront"), Jorge Martinez ("Martinez"), Gustavo Colon ("Colon"),[1] and Marisol Colon ("Marisol"), were tried before a jury and found guilty. Of the remaining ten defendants, seven, including Wilfredo Escobar ("Escobar") and Rene Herrera ("Herrera"), pleaded guilty prior to trial, the eighth was granted a motion to sever his trial, the ninth is a fugitive, and the tenth was dismissed from the indictment because he suffered severe brain damage in a drug-related beating.

The defendants, individually and collectively, appeal numerous issues. We reject all their arguments as the evidence of defendants' guilt was more than sufficient and the alleged trial errors were either nonexistent or clearly harmless. We affirm in all respects.

## I. BACKGROUND

We recount the basic facts and elaborate as called for in each specific issue.

In 1972, at age eighteen, Colon was sentenced to 30 to 60 years in prison for murder. *See People v. Colon*, 314 N.E.2d 664, 666 (Ill. App. Ct. 1974). That same year Colon became the leader of the Latin Kings street gang, a posi-

---

[1] Although Gustavo Colon is referred to as both Gustavo and Gino throughout the record, we will use his legal surname.

tion he has retained since that time.[2] Although incarcerated in the Illinois Department of Corrections, Colon directed and controlled the narcotics-related activities of the gang. The charges from this particular indictment pertain to a gang-related conspiracy from 1995 to September 17, 1997. Colon maintained his control through telephone calls and personal visits with his wife Marisol. He made telephone calls almost every evening to Marisol, who would often conference in other members of the conspiracy, including Souffront and Martinez. Under prison policy, prior to any inmate making a call, a recording is played which states that all conversations, except for calls to attorneys, may be recorded and monitored. Approximately seventy of Colon's telephone calls were played at trial.

Marisol served as Colon's advisor, informing him of the distribution activities of the conspiracy and facilitating communications between Colon and his key subordinates, Souffront, Martinez, and Escobar. Marisol received weekly payments through "street taxes," which represented a portion of the sales of the illegal drugs. Escobar testified that the payments to Marisol started at $500 a week for the first several weeks and then ranged from $500 to $1500 a week for the duration of the conspiracy.

Souffront acted as a "regional," or street boss, overseeing gang activity and ordering punishment for members

---

[2] At the sentencing hearing, Colon contested the fact that he was the "leader" of the Latin Kings in Chicago, Illinois. The government stated that there are two known factions of the Latin Kings, the north side (primarily Puerto Rican) and the south side (primarily Mexican). While the government characterized Colon as "the leader of the Latin Kings street gang," there was ample evidence showing that Colon, who is Puerto Rican, directed all of the narcotics dealings by the Latin Kings on the north side of Chicago.

who failed to follow gang law, in addition to keeping records of the drug sales. Colon demoted Souffront after police executed a search warrant at Souffront's apartment and recovered approximately 34 grams of powder cocaine, 21 grams of crack cocaine, and a .38 caliber handgun. After Colon replaced Souffront with Martinez as regional, Souffront withdrew from the conspiracy in February 1996 when Colon ordered him to be shot as punishment for leaving incriminating evidence in his apartment.

Herrera was Colon's main drug supplier. Herrera testified that during the time period involved, he delivered "a little bit over 44" kilograms of cocaine to Souffront, Escobar, and Martinez. There was also testimony that Escobar purchased at least 1 kilogram of cocaine from Ariel Ginjuama and 5 kilograms from Fernally Llanos. Escobar stated in his plea agreement that he was involved in the purchase of over 150 kilograms of powder cocaine, based on his grand jury testimony that during the eight months prior to his arrest in February 1997, he purchased an average of 5 kilograms of cocaine a week from Herrera. However, the district court judge based his sentencing determination on Herrera's 44 kilograms, and the 6 kilos Escobar purchased from the other two dealers, finding that Colon, Marisol, and Martinez were responsible for between 50 and 150 kilograms of cocaine. Colon was sentenced to life in prison, Martinez to 400 months, Souffront to 240 months, and Marisol to 120 months.

One of the primary issues raised on appeal, that of the prosecutor's failure to disclose exculpatory or impeachment evidence, originates from Martinez's sentencing hearing on January 20, 1999. The Assistant United States Attorney ("AUSA") requested that sentencing be postponed and that arguments be heard *in camera*. The district court judge granted the requests and an *in camera*

hearing was held that day with the AUSA and counsel for Martinez. The AUSA stated that he had recently learned of a potential problem with one of the law enforcement officers who participated in the search of Souffront's apartment and had testified at trial, Chicago police officer Jon Woodall ("Woodall"). Because Woodall was the subject of an active, ongoing criminal investigation, the AUSA did not identify him at that time and requested that all proceedings involving Woodall be held *in camera* until Woodall was indicted. The district court judge had a transcript prepared of the *in camera* hearing and ordered it to be read by all defense counsel who were not present at the hearing. Because the investigation was ongoing, the government presented a motion moving for the *in camera* and *ex parte* examination of documents relating to the investigation. The government outlined the nature of the investigation and impeachment evidence and suggested that the district court judge determine whether the impeachment evidence would have been material at trial without disclosing the evidence to the defendants.[3]

Based on a review of the material submitted by the government, the district court judge concluded that Woodall's credibility was compromised, and, absent full disclosure to the defendants, his testimony should be struck from the record. The government argued that the testimony should not be stricken and that the parties could make a determination as to whether Woodall's

---

[3] The government conceded that its investigation of the officer had begun prior to the defendants' trial and that the impeaching evidence should have been disclosed to the defendants during the trial. However, the three AUSAs involved in the trial advised the district court judge that they had no knowledge of the investigation. The judge believed them and accepted their statements as true.

credibility was material to the outcome of the trial without disclosing the evidence, maintaining that disclosure would compromise the ongoing investigation. The judge rejected this proposal and informed the government that if they were unwilling to disclose the materials relating to the investigation of Woodall, the judge would be forced to order a new trial. Some of the materials were eventually presented to defendants subject to a protective order. However, Judge Andersen ruled that several of the documents did not need to be disclosed because he determined that, even under the broadest possible interpretation of the government's obligation to disclose exculpatory or impeaching evidence, there were several documents which would not have been discoverable under *Giglio v. United States*, 405 U.S. 150, 154 (1972) (stating that materiality of the evidence is required and that undisclosed evidence "possibly useful to the defense but not likely to have changed the verdict" is not material).

In July 1999, defendants filed a motion for a *Giglio* hearing. On September 27, 1999, defendants filed a supplemental motion for a *Giglio* hearing and new trial, presenting six issues concerning withheld evidence[4] and arguing that the withholding of the evidence prejudiced their ability to defend themselves at trial. Those allegations related not only to Woodall's credibility but to alleged activities of a Bureau of Alcohol, Tobacco, and Firearms ("ATF") agent, and alleged perjury of one of the witnesses at trial.

In their joint brief, defendants contend: (1) the prosecutors were guilty of misconduct under *Giglio* by failing to disclose six instances of withheld evidence; (2) the

---

[4] As will be detailed later when addressing the individual issues, some of the material had already been disclosed to defendants, although they continue to argue none of it was known to them.

district court erred in admitting into evidence two photographs, one recovered during the search of Souffront's residence which showed Souffront, Martinez, and a third individual holding handguns, and the second, one of Colon, Martinez, and Escobar, taken at the Pontiac Correctional Institution; (3) their constitutional rights were violated under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because the indictment did not allege drug quantities; (4) their sentences pursuant to 21 U.S.C. § 841(a) were in violation of *Apprendi*; and (5) the district court erred under *United States v. Singleton*, 144 F.3d 1343 (10th Cir. 1998), *vacated on reh'g en banc by* 165 F.3d 1297 (10th Cir. 1999), and violated 18 U.S.C. § 201(c)(2) by allowing cooperating codefendants Escobar and Herrera and witness Santiago to testify in exchange for lenient sentencing recommendations.

In addition to the joint brief, Colon, Martinez, and Marisol filed separate briefs.[5] Colon separately appeals five issues, maintaining that: (1) his trial should have been severed from that of his codefendants; (2) the district court relied on inappropriate evidence during his sentencing hearing; (3) jury instruction No. 13 was erroneously submitted; (4) he was denied his constitutional right to a speedy trial; and (5) the district court erred when it failed to instruct the jury that it must unanimously agree on the acts which constitute a CCE. Martinez also argued the CCE conviction was erroneous, in addition to challenging his sentence.

---

[5] Although Marisol filed a separate brief, the only issue presented concerned the unconstitutionality of her sentence under *Apprendi*, in that the indictment did not specify drug quantity. That issue is addressed in the joint brief.

## II. ANALYSIS

**A. Joint Brief**

1. Undisclosed *Giglio* Material

Defendants maintain that the district court erred in failing to dismiss the indictment or grant a new trial based upon prosecutorial misconduct. Our review of a district court's denial of a post-trial motion for a new trial is deferential. *See Turner v. Miller*, 301 F.3d 599, 601 (7th Cir. 2002); *see also Amer. Nat. Bank & Trust v. Regional Trans. Auth.*, 125 F.3d 420, 431 (7th Cir. 1997) (citation omitted). We reverse the district court's denial of such a motion only upon a showing that the district court abused its discretion. *Carter v. Chicago Police Officers*, 161 F.3d 1071, 1079 (7th Cir. 1998). Under the abuse of discretion standard, we do not second-guess the decision of a trial judge, *Amer. Nat. Bank & Trust*, 125 F.3d at 420, nor do we reweigh the evidence. *See Alverio v. Sam's Warehouse Club, Inc.*, 253 F.3d 933, 939 (7th Cir. 2001). In reviewing a motion for a new trial, viewing the evidence in the light most favorable to the prevailing party, we draw all reasonable inferences that can be drawn from the evidence and will not set aside the jury's verdict if there is a reasonable basis in the record which supports that verdict. *See Carter*, 161 F.3d at 1079. Defendants, therefore, face a difficult burden in order to succeed. *See Alverio*, 253 F.3d at 939 ("[Defendant] bears a heavy burden in convincing us that the district court should have granted her a new trial."); *see also Amer. Nat. Bank & Trust*, 125 F.3d at 431.

The first issue of the joint brief repeats the six instances specified in the supplemental motion for a *Giglio* hearing and new trial alleging the government failed to disclose that: (1) Woodall's testimony lacked credibility because he was being investigated for the theft of cocaine from an unrelated drug dealer's car; (2) Woodall

committed perjury in swearing to the affidavit that provided the basis for the search warrant executed on Souffront's apartment; (3) Woodall stole cocaine and money from Souffront's apartment; (4) Woodall stole drugs, fabricated a search warrant, and engaged in criminal activity with respect to the arrest and prosecution of Evelyn Miranda ("Miranda") in an unrelated case; (5) an ATF agent in the instant case covered-up and allegedly participated in the theft of jewelry and money from an unrelated third party in a 1992 search; and (6) Escobar committed perjury in omitting to testify about his receipt and sale of drugs for another drug ring during his involvement with the charged conspiracy.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Impeachment evidence as well as exculpatory evidence falls within this rule. *Giglio*, 405 U.S. at 154; *see also United States v. Bagley*, 473 U.S. 667, 676 (1985). Such evidence also includes information which may be known only to the police investigators and not the prosecutors. *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995).

With a *Brady* challenge, a defendant must establish that the prosecution suppressed evidence, the evidence was favorable to the defense, and the evidence was material to an issue at trial. *United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995) (citations omitted). Like the case in *Bagley*, 473 U.S. at 678, where the government failed to assist the defense by disclosing information that might have been helpful in conducting cross-examination, "such suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial . . . and . . . only if the evidence is material in the sense that its suppression undermines confidence in the outcome of

the trial." The suppressed evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682; *see also Strickler v. Greene*, 527 U.S. 263, 280 (1999). In addition,

> the effect that a particular piece of evidence is likely to have had on the outcome of a trial must be determined in light of the full context of the weight and credibility of all evidence actually presented at trial. Having personally observed the entire proceeding, the district court judge is best positioned to make this determination.

*Silva*, 71 F.3d at 670.

Although we will address each of the six *Giglio* allegations individually, after reviewing the extensive record, we agree with the district court's determination in its unpublished memorandum opinion and order in response to defendants' motion and supplemental motion for a *Giglio* hearing and a new trial, holding that "[t]he staggering weight of the evidence at trial leads this Court to the certain conclusion that there was no reasonable probability of a different result at the trial even had all of the allegedly suppressed evidence been disclosed." The district court noted,

> During a nine-week trial, the jury listened to hours of evidence recorded on approximately seventy audio tapes. The tapes featured numerous conversations in which the Defendants spoke about the charged drug sales. The jury was presented with more than enough evidence from the lips of the Defendants to convict all of the Defendants.

a.  Woodall's testimony and impeachment evidence

Woodall testified that he and nine other officers executed a search warrant at Souffront's apartment. Woodall cata-

logued the evidence brought to him by the other officers. The items recovered included a .38 caliber handgun and a fire extinguisher with a false bottom which concealed a quantity of powder and rock cocaine. No substantive charges were based on this cocaine. The handgun, fire extinguisher, and cocaine were introduced into evidence at trial. The scope of Woodall's testimony involved identifying the exhibits which had been collected by the other officers.

The materials disclosed by the government indicate that Woodall was being investigated for allegedly stealing narcotics from the car of a purported drug dealer named Garza, who had no involvement in the defendants' conspiracy. The district court conceded this evidence would be favorable to the defendants in order to impeach the credibility of Woodall's testimony in defendants' case. However, the remaining question is whether this evidence was material to an issue at trial, *see Silva*, 71 F.3d at 670, which would then have changed the result of the trial if the information had been disclosed to the defendants. *See Bagley*, 473 U.S. at 682.

Defendants argue that Woodall was not a credible witness to the search of Souffront's apartment because he allegedly acted improperly on a prior occasion and that the evidence from the search should have been excluded because Woodall was involved. Defendants conclude this entitles them to a new trial yet they have not demonstrated that Woodall's testimony was false. In a single, tape-recorded conversation with Colon, Souffront corroborated Woodall's testimony. Souffront told Colon that the police "got a gun from the house," "took the rest of the [cocaine]," and recovered "the fire extinguisher." The trial record indicates Woodall's testimony was corroborated not only by other witnesses, including conversations between some of the defendants and testimony from Herrera and Escobar, but by the government's physical

evidence. Even without the evidence found in Souffront's apartment, additional evidence against the defendants was so overwhelming that it was sufficient to convict them of the charges. There was no reasonable probability that the outcome of the proceeding would have been different, *see Bagley*, 473 U.S. at 682, and the district court did not abuse its discretion in denying defendants' motion based on this factor.

b.  Woodall's search warrant affidavit

Defendants maintain that Woodall committed perjury in his affidavit in support of the search warrant for Souffront's apartment. Although all defendants join in this argument, only Souffront, who had an expectation of privacy in his apartment, has standing to challenge the affidavit. *See Minnesota v. Carter*, 525 U.S. 83, 91 (1998). Even had the evidence from Souffront's apartment been obtained through an illegal search and seizure, it would still be admissible against the other defendants. *See Rakas v. Illinois*, 439 U.S. 128, 134 (1978) ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."); *see also Terry v. Martin*, 120 F.3d 661, 664 (7th Cir. 1997).

Defendants state that "[t]he warrant is defective on its face and should have been quashed," based on the fact that the warrant contained a statement that police were told about Souffront's apartment from a reliable informant on February 4, **1994** but the warrant was signed and dated February 4, **1996**. A motion to quash a search warrant based on false information in the supporting affidavit is reviewed under the dictates of *Franks v. Delaware*, 438 U.S. 154 (1978). *See United States v. Jackson*, 103 F.3d 561, 573 (7th Cir. 1996).

Due to the procedure of the case, in that the undisclosed information was first revealed to the court at Martinez's sentencing hearing, Souffront never actually requested a *Franks* hearing. The district court, therefore, did not rule on whether or not Souffront was entitled to a hearing. Although the defendants have concentrated on arguing this issue as a *Giglio* violation, the possibility of a *Franks* hearing was raised in post-trial motions and analyzed under the *Franks* criteria in the district court's memorandum opinion and order in response to defendants' motion and supplemental motion for a *Giglio* hearing and new trial. Therefore, we will examine the underlying issue of the *Franks* hearing. *See United States v. McDonald*, 723 F.2d 1288, 1292-93 (7th Cir. 1983) (citation omitted).

In *Franks*, the Supreme Court held that intentionally or recklessly submitting false statements in the affidavit supporting a search warrant violates the Fourth Amendment. 438 U.S. at 164-65. The Court further held that in certain limited situations, a defendant may obtain a hearing to present evidence challenging the affidavit's truth. To obtain an evidentiary hearing, the defendant must make a "substantial preliminary showing" that the affiant has intentionally or recklessly included a false statement in the affidavit, and that the false statement is material in order to find probable cause. *Id.* at 155-56; *see also United States v. Hornick*, 815 F.2d 1156, 1158 (7th Cir. 1987) ("[defendant] bears a substantial burden to demonstrate probable falsity"). The defendant "must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts in order to prove deliberate falsehood or reckless disregard." *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir. 1990) (citation omitted).

If the material that is allegedly false is set aside, and "there remains sufficient content in the warrant affidavit

to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171-72. In addition, there is a presumption as to the validity of the affidavit supporting the search warrant which must be overcome. *Id.* at 171.

Souffront argues the warrant was "defective on its face" because of the differences in the two dates—February 4, 1994 and February 4, 1996. What he fails to note is that the complainant line of the cover page of the Search Warrant is dated 04 FEB 96, with the judge's signature and date of February 4, 1996 signed at the bottom. The first page of the Complaint for Search Warrant again begins with "On 04 FEB 96" and the judge's signature and date of February 4, 1996 signed at the bottom of the page. The second page of the Complaint reads, "The [reliable informant] stated that in the afternoon hours of 03 FEB 96, he went to [Souffront's] residence," and again is signed and dated February 4, 1996 by the judge. The singular appearance of 04 FEB 94 occurs in the probable cause paragraph on the first page of the Complaint. The district court correctly concluded that this singular occurrence of 1994 was merely a typographical error. A technical contradiction does not reveal a disregard of the truth. *United States v. Maro*, 272 F.3d 817, 822 (7th Cir. 2001).

Souffront also contends that "[a] *Franks* motion could have been filed if the warrant were not quashed outright" if the information concerning the investigation of Woodall had been disclosed. Again, Souffront must make a substantial showing that the affidavit contained erroneous information and that Woodall knew the affidavit was false or at least demonstrate that Woodall recklessly disregarded the truth. *See United States v. Amerson*, 185 F.3d 676, 687-88 (7th Cir. 1999) (citation omitted).

Evidently, Souffront bases this argument on Woodall's conduct concerning Garza, which we have already dis-

cussed and dismissed, and Woodall's alleged conduct in an unrelated search of Miranda's apartment in 1995, information which was part of the undisclosed material the court reviewed *in camera*. Miranda, arrested for narcotics offenses, alleged that statements made in support of the search warrant for her apartment were false and that the police officers who executed the search, one of whom was Woodall, stole a kilogram of cocaine. *See also People v. Miranda*, 769 N.E.2d 1000, 1003 (Ill. App. Ct. 2002). Woodall did not sign the affidavit in support of Miranda's warrant, and she made no specific allegations against him; she never mentioned him at any time. The state court judge held a *Franks* hearing at which Woodall was not asked to testify and denied Miranda's motion to suppress. Miranda was tried and convicted at that time.[6] Therefore, Miranda's allegations would not have been admissible against Woodall under FED. R. EVID. 608(b),

---

[6] Miranda's conviction was later vacated, *see Miranda*, 769 N.E.2d at 1003, based on the admissions of Chicago police officer John Galligan, who signed the Miranda search warrant. Galligan pleaded guilty to felony charges and stated that he had protected his partner, Joseph Miedzianowski, who had stolen the cocaine from Miranda's apartment. *See* Todd Lightly, *Ex-cop's Partner Guilty of Cover-up*, CHI. TRIB., Nov. 9, 2001, § 2, at 1. Miedzianowski, leader of a drug ring operating within the police department's gang crimes unit, was convicted on ten felony counts, including racketeering and drug conspiracy. *Id.*; *see United States v. Miedzianowski*, No. 98 CR 923, 2003 WL 280582, at *1 (N.D. Ill. Feb. 6, 2003); *United States v. Miedzianowski*, No. 98 CR 923, 2002 WL 737248, at *1 (N.D. Ill. Apr. 25, 2002).

However, there was no admissible evidence against Woodall at the time of defendants' trial. These later developments are irrelevant "because the question is whether the result would have changed if the prosecutors disclosed the evidence at the time, not whether the outcome would differ if the case were tried today." *United States v. Dimas*, 3 F.3d 1015, 1019 n.3 (7th Cir. 1993).

which only allows evidence concerning specific instances of witness conduct as to truthfulness or untruthfulness. *See United States v. Tomblin*, 46 F.3d 1369, 1389 (7th Cir. 1995).

At the time of defendants' trial, all the AUSAs knew was that there were unsubstantiated allegations against several Chicago police officers, but none directly accusing Woodall, who had participated in the search of Souffront's and Miranda's apartments, of misconduct. The failure to disclose untrustworthy and unsubstantiated allegations against a government witness is not a *Brady* violation. *See United States v. Locascio*, 6 F.3d 924, 948 (7th Cir. 1993). While it is unlikely this information would have been admissible to cast doubt on Woodall's credibility, we do not believe the AUSAs withheld material evidence or that defendants were prejudiced by the nondisclosure of the information. Defendants' trial ended in July 1998, and it was not until the fall of 1998 that government wiretaps revealed the truth of Miranda's allegations.

Souffront does not make a clear or concise argument but insists that Woodall's alleged involvement in the Miranda theft, along with other evidence, would have required a *Franks* hearing, resulting in suppression of the warrant and thereby "negating [defendants'] guilt." However, Souffront must make a "substantial preliminary showing" that Woodall lied in the affidavit. Souffront continues to argue that because one of the officers indicted in the Miranda case was found to have made false statements in the affidavit for a search warrant, and Woodall was one of the officers present at the execution of the Miranda search warrant, then Woodall must have made false statements in this case. Souffront has failed to identify any false statement in the affidavit nor has he established that there was a false statement material to probable cause. The presumption of validity cannot be overcome by defendant's self-interested inferences and conclusory

statements. *McDonald*, 723 F.2d at 1294 (citing *Franks*, 438 U.S. at 171). The district court did not abuse its discretion in denying defendants' motion for a new trial based on Woodall's alleged perjury in the search warrant.

c.  Woodall's alleged theft from Souffront's apartment

Again, only Souffront has standing to contest this issue concerning the search of his apartment. *See Rakas*, 439 U.S. at 134. And again, the argument on this issue lacks any clarity beyond stating that "Officer Woodall stole cocaine and money from Souffront's apartment on February 5, 1996, and other personal property." The consolidated brief states:

> [W]e know from the allegations of Rene Herrera that there was substantially more than 44 grams of cocaine at Souffront's house on February 5, 1996. It also seems unusual that the officers failed to inventory any money following that search. Clearly, materials similar to those stolen at Miranda's house were present in Souffront's house.

Souffront has not presented any facts or evidence supporting the conclusion he infers from these assertions. In fact, in making this argument, he contradicts a previous statement he made to Officer Michael Cusack and ATF agent Terry Jackson and taped telephone conversations which indicated that the only things taken were the gun, some cocaine, and the fire extinguisher. There is no evidence that there were substantial quantities of cocaine in the apartment or that money had been taken. Souffront continues to point to Woodall's alleged behavior concerning Garza and Miranda and concludes that Woodall must have stolen from Souffront's apartment because Woodall was with a group of police officers who had allegedly stolen money and/or property before. Even if Woodall's testimony were totally compromised to render the search invalid, given the weight of the evidence,

Souffront has not shown there was a reasonable probability the trial verdict would have been different. *See Bagley*, 473 U.S. at 682; *see also Strickler*, 527 U.S. at 280.

d.  Woodall's alleged criminal activity in the Miranda search

The merits of this issue have previously been discussed and dismissed.

e.  ATF agent's alleged corruption

ATF Special Agent Laurie Jolley ("Jolley") was one of the investigators in this case. In 1994, a discharged ATF supervisor filed a civil suit against the ATF which contained allegations of misconduct against Jolley, claiming that during the execution of a search warrant, Jolley participated in or assisted in the cover-up of the theft of jewelry and money by Miedzianowski, one of the police officers from the Miranda case who was eventually convicted of racketeering and distribution of narcotics. *See Klipfel v. Bureau of Alcohol, Tobacco and Firearms*, No. 94 C 6415, 1996 WL 566452 (N.D. Ill. Sept. 27, 1996). Defendants maintain the government failed to disclose these allegations against Jolley. Although the district court believed the government had provided defendants with this information, even had they not, the use of this information to impeach Jolley's testimony at trial would have been of no assistance to defendants as Jolley testified only on behalf of the defendants. The defendants called Jolley to impeach Herrera's testimony and to testify as to Marisol's state of mind when the ATF agents arrested and interrogated her. Impeaching the testimony of their own witness is not favorable to the defense, *see Brady*, 373 U.S. at 87, and does not raise the probability of a different verdict. *Bagley*, 473 U.S. at 682. This argument is without merit.

f. Escobar's alleged perjury

Defendants maintain that Escobar's testimony at trial indicated his only source for obtaining drugs was defendants' gang and that the government failed to disclose information that Escobar was involved in other drug deals besides those of defendants. Again, defendants' argument is rambling and inferential. Defendants imply that, had they known Escobar was dealing with other parties, they could have used that evidence to show that the quantity of drugs Escobar received came from other sources, not defendants. Defendants had received discovery materials in which Escobar stated that he had other sources. As part of pretrial discovery in the instant case, defendants received surveillance reports indicating that Escobar was visiting the apartment building of a known supplier. Prior to trial, defendants received a videotape made of Escobar after his arrest in which he acknowledges he had other suppliers. Defendants used a copy of that videotaped statement during cross-examination, yet failed to question him about receiving drugs from other sources. At trial, Escobar testified that while he dealt cocaine from 1980 through 1996, he had "[a]bout ten, at least" suppliers, in addition to the defendants. Defendants also rely on the plea agreement of Yolanda Navarro, another of Escobar's drug suppliers. However, her plea agreement does not mention Escobar by name or alias. Defendants argument as to Escobar's perjury is without merit.

Based on the above-stated arguments, taken individually or cumulatively, defendants have failed to meet the necessary requirements to grant a *Giglio* hearing or new trial. The district court did not abuse its discretion in denying defendants' motion and, given the overwhelming evidence of record, there is no reasonable probability the withheld evidence would have produced a different verdict. *See Strickler*, 527 U.S. at 280.

2. Two photographs

Trial courts have broad discretion to admit or exclude evidence, and we review the district court's decision to admit trial evidence under an abuse of discretion standard. *United States v. Spiller*, 261 F.3d 683, 688 (7th Cir. 2001). Defendants maintain that the district court abused its discretion in allowing two photographs to be entered as government exhibits which unfairly prejudiced certain defendants. The first was a photograph recovered during the search of Souffront's apartment which showed Souffront, Martinez, and a third individual, all holding handguns. The second was a twelve-year-old photograph recovered during a search of Martinez's residence which was taken at the Pontiac Correctional Institution in 1986 showing Colon, who is giving a Latin Kings gang sign with his hand in the photograph, Martinez, and Escobar, along with several other unidentified males. Taped to the top of this photograph are the words "Arriba la Gente," translated as "Long live the Nation."[7] Taped to the bottom is the word "Gunmen."

Although defendants objected at trial to the admission of the photographs under FED. R. EVID. 403, the district court admitted the photographs as relevant evidence to establish the association between codefendants and their propensity towards violence. The first photograph shows that there is some type of relationship between Souffront and Martinez and that they are familiar and at ease with handguns. The second photograph indicates Colon, Martinez, and Escobar were all criminals with possible gang affiliation who had been incarcerated together, and are identified as gunmen and supporters of the "Nation."

---

[7] Another photograph, which was not contested by defendants, was of Colon wearing a belt buckle showing the initials ALKN, for the "Almighty Latin King Nation."

The photographs were therefore relevant and probative of the allegations in the indictment.

Defendants renew their argument that the photographs should have been excluded under Rule 403, which provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The court must consider whether the probative value of the evidence outweighs its prejudicial value. *See Cook v. Hoppin*, 783 F.2d 684, 689 (7th Cir. 1986). However, evidence of gang membership has been admissible in cases where the interplay between the people is central to proving the elements of the conspiracy. *See United States v. Thomas*, 86 F.3d 647, 652 (7th Cir. 1996).

While it is true that all probative evidence is prejudicial to the party against whom it is introduced, in this case the prejudice was not unfair. *See United States v. Adames*, 56 F.3d 737, 742 (7th Cir. 1995). The photographs of the defendants are not sufficiently shocking or repulsive to necessarily elicit an emotional response from the jury. *See id.*; *see also United States v. Peters*, 791 F.2d 1270, 1294 (7th Cir. 1986) (finding that evidence is unfairly prejudicial if it arouses a sense of horror or produces an emotional response that would cause the jury to base its decision on something other than the evidence), *superseded by statute on other grounds as stated in United States v. Guerrero*, 894 F.2d 261, 267 (7th Cir. 1990). Therefore, the district court did not abuse its discretion by allowing the photographs into evidence.

3. *Apprendi* claims

Defendants concede that, because they are challenging the legality of the district court's drug quantity determina-

tions for the first time on appeal, the standard of review is for plain error. *United States v. Nance*, 236 F.3d 820, 824 (7th Cir. 2001). For an error to be plain, it must be determined to have seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Johnson v. United States*, 520 U.S. 461, 467 (1997) (citations omitted). The applicability of *Apprendi* is a question of law reviewed *de novo. See Spiller*, 261 F.3d at 692 (citation omitted).

Defendants maintain *Apprendi* requires that the quantity of drugs involved has to be charged in the indictment and proved beyond a reasonable doubt. However, it is well-recognized in both the Seventh Circuit and sister circuits that "the *Apprendi* rule applies only to drug quantities that permit a sentence in excess of the default statutory maximum . . . ." *Nance*, 236 F.3d at 825; *see Apprendi*, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

The default statutory maximum for a conviction under 21 U.S.C. § 841 which involved cocaine, a Schedule II controlled substance as per 21 U.S.C. § 812(c), is twenty years. 21 U.S.C. § 841(b)(1)(C). The statutory maximum for a CCE conviction is life imprisonment. 21 U.S.C. § 848(a). Colon was sentenced to life imprisonment under the CCE count and 96 months concurrently on each of the substantive drug violations. Martinez was sentenced to 400 months imprisonment based on the CCE count and 96 months concurrently on each of the substantive violations. Souffront was sentenced to twenty years based on his convictions for the conspiracy count and substantive drug charges. Marisol was sentenced to ten years based on her convictions for three violations, including the conspiracy count. All defendants received sentences at

or below the maximum levels applicable to them. Even under *de novo* review, there were no *Apprendi* violations.

Marisol argues that her mandatory minimum ten-year sentence was not binding under *Apprendi*. However, *Apprendi* does not apply to statutory mandatory minimum sentences. *See Harris v. United States*, 536 U.S. 545, 568-69 (2002).

### 4. *Singleton* claim

Based solely upon *Singleton*, 144 F.3d 1343, a vacated case from the Tenth Circuit, defendants contend the indictment should have been dismissed because cooperating witnesses Escobar, Herrera, and Santiago allegedly testified in exchange for leniency, a violation of 18 U.S.C. § 201(c)(2).[8] The decision in *Singleton* was immediately stayed and soon after withdrawn. *See United States v. Singleton*, 165 F.3d 1297 (10th Cir. 1999) (*en banc*). All circuits except for the Federal Circuit[9] have rejected *Singleton*'s original holding. *See United States v. Condon*, 170 F.3d 687, 688 (7th Cir. 1999) (listing cases); *see also*

---

[8]  18 U.S.C. § 201(c)(2) states:

> (2) directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom; . . . .

[9]  The Federal Circuit has nationwide jurisdiction to hear appeals in specialized cases such as those involving patent law or cases decided by the Court of International Trade and the Court of Federal Claims, and has never had occasion to address the *Singleton* issue.

*United States v. Lara,* 181 F.3d 183, 198 (1ˢᵗ Cir. 1999); *United States v. Stephenson*, 183 F.3d 110, 118 (2d Cir. 1999); *United States v. Hunte*, 193 F.3d 173, 174 (3d Cir. 1999); *United States v. Richardson*, 195 F.3d 192, 197 (4ᵗʰ Cir. 1999); *United States v. Smith*, 196 F.3d 1034, 1038-39 (9ᵗʰ Cir. 1999). Defendants' position is without merit and we hope that future defendants will refrain from presenting such frivolous arguments supported by absolutely no authority and contrary to clearly-stated precedent.

## B.  Colon's Brief

Colon argues that: (1) his trial should have been severed from that of his codefendants; (2) the district court relied on inappropriate evidence during his sentencing hearing; (3) jury instruction No. 13 was erroneously submitted; (4) he was denied his constitutional right to a speedy trial; and (5) the district court erred when it failed to instruct the jury that it must unanimously agree on the acts which constitute a CCE.

### 1.  Severance

Colon filed a pretrial motion to have his trial severed from that of his codefendants, which the district court denied. Colon maintains that his trial should have been severed because: (1) the statements of both Marisol and Souffront were submitted into evidence but neither testified and were therefore not subject to cross-examination; (2) Marisol presented prejudicial evidence in connection with her defense that she participated in the conspiracy because she was under the "psychological domination" of Colon; and (3) other codefendants presented similar "mutually antagonistic" defenses, in that "the appearance of one party's defense preclude[d] the acquittal of the other defendant." *United States v. Zafiro*, 506 U.S. 534, 537 (1993) (citation omitted).

We review the denial of a motion to sever for an abuse of discretion. *United States v. Smith*, 223 F.3d 554, 573 (7th Cir. 2000) (citation omitted). Multiple defendants may be tried together "if they are alleged to have participated . . . in the same series of acts or transactions, constituting an offense or offenses." FED. R. CRIM. P. 8(b). In fact, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together. Joint trials 'play a vital role in the criminal justice system.' They promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Zafiro*, 506 U.S. at 537 (quoting *Richardson v. Marsh*, 481 U.S. 200, 209-10 (1987)). There is a particularly strong preference for a single trial with codefendants who have been jointly indicted. *See United States v. McClurge*, 311 F.3d 866, 871 (7th Cir. 2002) (citation omitted).

However, "[i]f the joinder of offenses or defendants in an indictment . . . or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." FED. R. CRIM. P. 14(a). In addition, "Rule 14 does not require severance even if prejudice is shown; rather it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538-39. When defendants have been properly joined under Rule 8(b), "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. "A defendant must demonstrate that the denial of severance caused him 'actual prejudice' that deprived him of his right to a fair trial; it is insufficient that separate trials would have given a defendant a better opportunity for an acquittal." *United States v. Rollins*, 301 F.3d 511, 518 (7th Cir. 2002) (citations omitted); *see also Zafiro*, 506 U.S. at 540.

a. Statements of nontestifying codefendants

In *Bruton v. United States*, the Supreme Court held that a defendant's Sixth Amendment right to confront witnesses against him is violated when the confession of a nontestifying codefendant, in which the defendant is *expressly implicated* as a participant in the crime, is admitted in the joint trial of the two defendants, even if the jury is instructed to consider the confession only against the confessing codefendant. 391 U.S. 123, 135-36 (1968). In *Bruton*, one of two jointly-tried defendants did not testify but had admitted to committing armed robbery and named the second defendant as his accomplice. *Id.* at 124.

In *Richardson*, a joint trial of two defendants with the third respondent a fugitive at the time of trial, the Court held there was no *Bruton* violation where the nontestifying codefendant's statement was redacted to remove all reference to the defendant and his existence and the jury was given a proper limiting instruction. 481 U.S. at 202, 211. The redacted statement, unlike the defendant's confession in *Bruton*, was not incriminating because it did not directly implicate the other defendant in the crime; therefore, there was no *Bruton* violation. *Id.* at 208; *United States ex rel. Cole v. Lane*, 752 F.2d 1210, 1216 (7th Cir. 1985).

In *Gray v. Maryland*, 523 U.S. 185 (1998), again a case with only two defendants, the Court stated that even though the redactions in the confession of the nontestifying codefendant replaced the defendant's name with a deletion or blank space, a *Bruton* violation occurred because "the redacted confession with the blank prominent on its face . . . '*facially* incriminat[es]' the codefendant." *Id.* at 196 (emphasis in original) (quoting *Richardson*, 481 U.S. at 209). However, we held that the substitution of a defendant's name with a neutral pronoun or phrase in a

codefendant's confession which does not "strategically incriminate much less implicate" the defendant does not violate *Bruton*. *Cole*, 752 F.2d at 1216. In *Cole*, two defendants were jointly tried for armed robbery. Witnesses and one codefendant stated that three men participated in the robbery. *Id.* The use of neutral pronouns in the codefendant's redacted statement, a statement which did not specifically incriminate or implicate the other defendant, does not violate the holding in *Bruton*. *Id.*; *see United States v. Hernandez*, 330 F.3d 964, 973 (7th Cir. 2003) ("it is clear that a redacted confession may be admitted as long as the redaction does not obviously refer to the co-defendants").

Marisol was interviewed by Agent Jolley on September 18, 1997, and signed a statement made of that interview. That statement was read at trial. The only sentence in Marisol's statement referencing Colon was, "One person directed the flow of money that members of the street gang received from the sale of drugs." There is no direct incrimination much less implication that this person was Colon, particularly in light of the number of codefendants and numerous references in Marisol's statement concerning the many gang members she worked with. The district court instructed the jury that the statement was not admissible against any defendant other than Marisol.

In Souffront's initial statement to Officer Cusack and Agent Jackson, he admitted he held a certain position within the Latin Kings gang and that he dealt drugs for them. He later made a second statement to Cusack and Jackson, providing a list of Latin Kings members from whom he had collected drug money and how much money was collected. Both statements were read at trial. There was no direct incrimination or implication of Colon. And again, the district court offered a limiting instruction to the jury.

There was no *Bruton* violation in either Marisol's or Souffront's statements. Colon has incorrectly argued that both codefendants' statements "implicate" him. Colon must show that the redacted statements "expressly," "facially," or "directly" implicate him. *Richardson*, 481 U.S. at 208 (citing *Bruton*, 481 U.S. at 124 n.1); *Gray*, 523 U.S. at 196; *Cole*, 752 F.2d at 1216. He has failed to do so.

Even had there been a *Bruton* error, that error would have been harmless. *See Hernandez*, 330 F.3d at 974 (citing *United States v. Hoover*, 246 F.3d 1054, 1059-60 (7th Cir. 2001)). After a nine-week trial, the evidence of a narcotics conspiracy was substantial. *See id.* The codefendants basically convicted themselves with seventy hours of recorded conversations. *See Hoover*, 246 F.3d at 1059-60.

Colon also maintains that these statements bolster the testimony of other witnesses. The Supreme Court declined to expand *Bruton* to include a statement which is not incriminating on its face but becomes so when "linked" with other evidence at trial. *Richardson*, 481 U.S. at 208-09. If a proper limiting instruction is given to the jury, a redacted statement which incriminates a defendant only in conjunction with other evidence in the case does not violate *Bruton*. *Id.*; *Cole*, 752 F.2d at 1216.

In addition, Colon contends, but makes no argument, that "Martinez was implicated in the 'hit' on Souffront and was not subject to cross-examination." Colon provides no facts to substantiate his inference that Martinez may have been responsible for the hit. Evidence of the proposed hit was introduced through the government tapes of Colon's conversations with Marisol and Martinez. Colon warned of a possible hit on Souffront and instructed Marisol and Martinez to stay away from him. These conversations were admitted as an admission by a party and as statements by a coconspirator. FED. R. EVID. 801(d)(2)(A) & (E). The district court did not abuse its discretion in allowing any of these statements into evidence.

b.  Psychological domination evidence

Colon asserts a *Bruton* violation based on the testimony of Dr. Teresa Risolo ("Dr. Risolo"), who was called at trial by Marisol as an expert witness. Dr. Risolo, a clinical psychologist who had interviewed, tested, and evaluated Marisol, testified that Marisol was highly dependent on Colon and would do anything for him. Dr. Risolo also stated that Marisol had difficulty expressing disagreement, was easily manipulated, and was unable to use critical thinking. Marisol's attorney then argued that she was incapable of forming the intent to participate in and promote the drug conspiracy. Colon maintains that, "[s]ince Marisol Colon did not testify none of these matters were subject to cross-examination."

Prior to Dr. Risolo's testimony, the district court instructed the jury:

> I anticipate that during Dr. Risolo's testimony she will relate statements that were made to her by Marisol Colon. I instruct you that those statements may not be considered by you for the truth of the matters asserted in them. I further instruct you that Dr. Risolo's testimony may not be considered by you against any other defendant.

The district court repeated the instruction prior to jury deliberations.

The majority of Dr. Risolo's testimony dealt with Marisol's childhood and adolescence, which Dr. Risolo stated were the basis of her dependent personality disorder. Her statements regarding Marisol and Colon were extremely general, including the fact that Marisol met and married Colon while he was incarcerated (with no mention of his crime or term of imprisonment), that he gave her money (with no mention of where the money came from), that Colon showed warmth and kindness towards Marisol, that Marisol had two children with him, that Marisol knew of Colon's infidelities, that Marisol did

not want to be a secretary for Colon, and that Marisol had made general comments to Dr. Risolo about the value of gangs. There is no basis for a *Bruton* violation because there is no direct criminal implication of Colon in any of these statements.

c. Mutually antagonistic defenses

The occurrence of mutually antagonistic defenses is generally not sufficient grounds to require severance. *See United States v. Mietus*, 237 F.3d 866, 873 (7ᵗʰ Cir. 2001) (citing *Zafiro*, 506 U.S. at 538).

> The courts have reversed relatively few convictions for failure to grant a severance on grounds of mutually antagonistic or irreconcilable defenses. . . . Mutually antagonistic defenses are not prejudicial *per se*. . . . [and] Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.

*Zafiro*, 506 U.S. at 538 (citations omitted).

When defendants have been properly joined, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. A defendant must demonstrate that the denial of severance caused him "actual prejudice." *United States v. Lane,* 474 U.S. 438, 449 (1986). "Actual prejudice" occurs when a defendant has been deprived of his right to a fair trial; "it is insufficient that separate trials would have given a defendant a better opportunity for an acquittal." *Rollins*, 301 F.3d at 518 (citations omitted); *see also Zafiro*, 506 U.S. at 540. Defendant has not demonstrated any actual prejudice requiring severance.

Even if the district court had erred in denying Colon's severance motion based on mutually antagonistic defenses, the misjoinder of defendants is harmless error if the jury was appropriately instructed to "give separate consideration to each individual defendant and to each separate charge against him." *Zafiro*, 506 U.S. at 541. "In *Lane*, the Supreme Court relied upon the presence of instructions requiring the jury to consider each defendant separately, the likelihood that evidence relating to the misjoined count would have been admitted in a separate trial and the strong evidence of the defendant's guilt in concluding that the misjoinder was harmless." *United States v. Diaz*, 876 F.2d 1344, 1356 (7th Cir. 1989) (citing *Lane*, 474 U.S. at 450). Proper jury instructions are "an adequate safeguard against the risk of prejudice in the form of jury confusion, evidentiary spillover and cumulation of evidence." *United States v. Alexander*, 135 F.3d 470, 478 (7th Cir. 1998) (internal quotations and citations omitted). The district court provided the proper limiting jury instructions. The vast majority, if not all, of the evidence admitted in the joint trial would have been admissible had Colon been tried alone, and the evidence against Colon was overwhelming. Defendant has failed to demonstrate actual prejudice on this issue. The district court did not abuse its discretion in denying the motion for severance based on any of the arguments presented by Colon.

2.  Inappropriate evidence during the sentencing hearing

Colon's convictions[10] in the instant case were for a CCE violation under 21 U.S.C. § 848 (count 2), use of a tele-

---

[10] Colon's and Martinez's convictions on count 1, for a drug conspiracy in violation of 21 U.S.C. § 846, were vacated subsequent to a post-trial motion. The district court held that the conspiracy convictions violated the double jeopardy clause because Colon and Martinez were also convicted of count 2 for engaging in a CCE.

phone to facilitate a drug felony in violation of 21 U.S.C. § 843(b) (counts 3-9, 13, 16), and distribution of cocaine in violation of 21 U.S.C. § 841 (counts 10-12, 14, 15, 18-21). For each count except the CCE, the district court calculated the base offense level at 36 because more than 50 kilograms of cocaine were involved in the conspiracy. *See* U.S.S.G. § 2D1.1(c)(2) ("At least 50 KG but less than 150 KG of Cocaine"). The district court then added a two-level enhancement for the involvement of a dangerous weapon pursuant to § 2D1.1(b)(1) and a four-level enhancement for Colon's leadership role pursuant to § 3B1.1(a), arriving at a final offense level of 42.

Colon argues that the three enhancements—for drug quantity, use of a dangerous weapon, and a leadership role—violated *Apprendi*. Colon also maintains that the district court erred in placing his criminal history category at level VI, that of a career offender.

a. Drug quantity

The district court's calculation concerning the quantity of drugs involved in an offense is a finding of fact which will be reversed only for clear error. *United States v. Hall*, 109 F.3d 1227, 1233 (7th Cir. 1997). The finding will be affirmed unless we are "left with the definite and firm conviction that a mistake has been committed." *Id.* (citation omitted). Because the drug quantity table assigns a base offense of 36 to narcotics-related conduct involving 50 to 150 kilograms of cocaine, *see* U.S.S.G. § 2D1.1(c)(2), we must determine whether the evidence permits the attribution of at least 50 kilograms of cocaine to Colon.

As the district court noted at sentencing, "I have no doubt in my mind that this—this portion of Mr. Colon's life—this particular criminal conspiracy involved the distribution of over, over 50 kilograms of cocaine." Based on the evidence that more than 44 kilograms were pur-

chased from Herrera, 5 kilograms from Llanos, more than 1 kilogram from Ginjuama, and the estimated street taxes paid to Marisol during the 138 weeks of this particular conspiracy, the district court made a conservative calculation and did not err in finding the conspiracy involved more than 50 kilograms, thereby assigning Colon a base offense level of 36.

Colon challenges the credibility of the witnesses as to the quantity of drugs and contends their testimony should not have been relied on under *Apprendi*. *Apprendi* does not affect or alter calculations of relevant conduct or other guideline determinations for sentences that fall within the statutory maximum. *See Talbot v. Indiana*, 226 F.3d 866, 869 (7th Cir. 2000). In addition, credibility questions like these are for the trier of fact to resolve in all but the most extraordinary circumstances. *See Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985); *United States v. House*, 110 F.3d 1281, 1286 (7th Cir. 1997); *see also United States v. Noble*, 246 F.3d 946, 953 (7th Cir. 2001) ("we defer to the district court's determination of witness credibility, which can virtually never be clear error"). Colon has not provided any valid reason why the district court should have been precluded from crediting the witnesses in making sentencing determinations. We find no clear error in the district court's drug quantity calculation.

b.  Weapon enhancement

We review the court's decision to impose a U.S.S.G. § 2D1.1 enhancement for clear error. *United States v. Watson*, 189 F.3d 496, 501 (7th Cir. 1999). A weapon found in "close proximity" to illegal drugs is presumptively considered to have been used in connection with the drug trafficking offense. *United States v. Grimm*, 170 F.3d 760, 767 (7th Cir. 1999). Once the government meets the initial burden of demonstrating that the defendant "possessed

a weapon in a place where drugs were present," the burden shifts to the defendant to show that it was "clearly improbable" that the weapon was connected with the offense. *Id.*

A two-level enhancement is imposed by § 2D1.1(b)(1) for possession of a dangerous weapon, pursuant to Colon's convictions under 21 U.S.C. § 841. Not only was a gun found in the apartment of Colon's named regional street boss and enforcer, but, as the court noted, Colon ordered that "Souffront's punishment [for the discovery of drugs and a gun in his apartment] was to be shot." Testimony at trial revealed that weapons were carried and used for disciplinary and security purposes as part of the conspiracy. The district court did not err in determining it was reasonably foreseeable that Colon, as leader of the drug conspiracy, knew guns were involved in maintaining and enforcing the work of the conspiracy.

c.  Leadership enhancement

A four-level enhancement was applied under U.S.S.G. § 3B1.1(a) as Colon was found to be an organizer or leader of a conspiracy involving five or more participants, pursuant to a conviction under 21 U.S.C. § 841. The sentencing court's application of § 3B1.1 is reviewed for clear error. *United States v. Gracia,* 272 F.3d 866, 876 (7th Cir. 2001). We will reverse only if there is a "definite and firm conviction" that a mistake has been made. *Id.* at 876 (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395 (1948)).

The jury was charged with the burden of determining Colon's role in the conspiracy when given the instruction that they must "unanimously agree . . . that the defendant you are then considering organized, supervised or managed five or more persons within the same time period charged in the indictment in committing the series

of offenses." The overwhelming evidence indicated, as the district court stated, that "every single witness treated himself as a subordinate to Gino Colon" and "there was unanimous agreement on his authority."

Colon also argues that the leadership enhancement, in conjunction with the CCE conviction, results in double-counting in the calculation of his sentence. However, the CCE calculation is imposed by § 2D1.5, excluding any enhancement for a leadership role. *See* U.S.S.G. § 2D1.5, cmt. n.1. There was no double-counting.

d.  Prior convictions

Colon's criminal history was calculated as category VI. He was convicted of murder in 1971 and had served twenty-five years of that sentence when he was released to the U.S. Marshals Service in relation to the charges in the current case. Colon argues that this sentence "likely" violated *Apprendi* and is not applicable under U.S.S.G. § 4A1.2(e)(1) because the sentence for murder was imposed thirty-one years prior to the instant offense. Section 4A1.2(e)(1) specifically directs the court to "count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during [the fifteen years prior to defendant's commencement of the instant offense]." Colon has misread the statute.

While incarcerated in 1989, Colon pled guilty to possession of heroin with intent to deliver. Colon maintains that the conviction cannot count because he was framed and was not actually guilty, even though he pled guilty. When a defendant pleads guilty, he may not later challenge that admission before the federal appellate court. *See United States v. Wallace*, 280 F.3d 781, 784 (7ᵗʰ Cir.), *cert. denied*, 536 U.S. 949 (2002).

Section 4B1.1 mandates that when the defendant is at least eighteen years old at the time of conviction in the current case, and the current conviction is a felony that is either a crime of violence or a controlled substance offense, and the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense, the criminal history is Category VI, that of a career offender. Colon is over eighteen, his current convictions are for controlled substance offenses, and he has been convicted of two previous felonies, murder and possession of heroin with intent to deliver. The district court correctly placed him as a Category VI career offender.

e.  CCE conviction

For the CCE count, U.S.S.G. § 2D1.5 imposes either a base offense level of 38 or 4 plus the offense level required by the drug quantity as determined in § 2D1.1, whichever is the greater. Under § 2D1.1, level 36 was applied according to drug quantity, then adding the two-level enhancement for possession of a dangerous weapon, as mandated by § 2D1.1(b)(2), arriving at a base offense level of 38. Under § 2D1.5, the base offense level must then be 42 (38 plus 4), as the greater of 38 or 42 must be imposed. The district court correctly calculated Colon's base offense level at 42 for the CCE count, with a criminal history Category VI, allowing for a sentencing range of 360 months to life.

3.  Jury instruction No. 13

We review the instructions the district court gave to the jury as a whole and reverse "only if the jury instructions viewed as a whole, misguide the jury to the litigant's prejudice." *United States v. Rodriguez-Andrade*, 62 F.3d 948, 953 (7th Cir. 1995); *see also Smith*, 223 F.3d at 566. As

long as "the instructions treat the issues fairly and accurately," they will not be disturbed on appeal. *United States v. Thibodeaux*, 758 F.2d 199, 202 (7th Cir. 1985) (internal quotations and citation omitted).

Jury instruction No. 13 states:

> You have heard evidence of acts of Gustavo Colon other than those charged in the indictment. You may consider this evidence only on the question of plan, preparation and intent. The evidence is to be considered by you only for this limited purpose and may not be considered against the other defendants.

Colon argues that this instruction encouraged the jury to consider both his prior criminal history and the testimony of Dr. Risolo.

Colon's prior criminal history was allowed under FED. R. EVID. 404(b) as evidence of other crimes, wrongs, or acts "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." Limiting instructions are sufficient to cure potential prejudice resulting from the admission of Rule 404(b) evidence. *See United States v. Asher*, 178 F.3d 486, 495 (7th Cir. 1999) (citations omitted). The district court properly weighed the Rule 404(b) factors and observed numerous safeguards to reduce the possibility of unfair prejudice. *See id.* The district court did not abuse its discretion in allowing the 404(b) evidence and did not err in using jury instruction No. 13. As to Dr. Risolo's testimony, Colon merely reiterates his arguments about the confrontation clause and severance, which we have already dismissed as without merit.

4. Speedy trial

Colon argues that he was denied his right to a speedy trial under the Sixth Amendment. The Sixth Amendment

provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend. VI. The Sixth Amendment right to a speedy trial is triggered by an arrest, an indictment, or some other type of official accusation. *See Doggett v. United States*, 505 U.S. 647, 655 (1992); *United States v. Dote*, 328 F.3d 919, 922 (7th Cir. 2003). A defendant's trial must "commence within seventy days from the filing date . . . of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). A number of exclusions may be invoked which do not count against the seventy days. 18 U.S.C. § 3161(h).

The seventy days does not begin to run until all defendants have been arraigned. *United States v. Baker*, 40 F.3d 154, 159 (7th Cir. 1999) (citing *Henderson v. United States*, 476 U.S. 321, 323 n.2 (1986)). In addition, any delays attributable to the filing and resolution of any defendant's pretrial motions are excluded from the seventy days. 18 U.S.C. § 3161(h)(1)(F). Under § 3161(h)(7), "the excludable delay of one defendant may be ascribed to all codefendants in the same case, absent severance." *Baker*, 40 F.3d at 159 (citation omitted).

Colon was indicted on September 17, 1997, as one of fourteen codefendants. Charlie Alejandro, a fugitive and the final codefendant to be located, was arraigned on January 15, 1998. On that date, the seventy-day clock commenced. On that same day, Colon moved for additional time to file pretrial motions, stopping the clock. The request was granted and the deadline for filing pretrial motions was set for February 8. Colon subsequently requested and was granted several additional extensions. On March 20, 1998, Colon filed his pretrial motions and a motion for a bill of particulars. On April 3, the government responded. The district court ruled on the motions

on April 13. Consequently, this entire period was properly excluded from the speedy trial calculation. Colon's trial began on May 18, 1998, thirty-five days after the April 13 resolution of his pretrial motions and motion for a bill of particulars. Colon's trial commenced within the seventy-day period as required by 18 U.S.C. § 3161(c)(1). *See Baker*, 40 F.3d at 159.

5.  CCE jury instruction

Martinez joins Colon in correctly arguing that the district court should have instructed the jury that they must unanimously agree on which three or more drug violations constitute a CCE. *See Richardson v. United States*, 526 U.S. 813, 824 (1999). Defendants maintain this failure requires reversal of their CCE convictions. However, at the time of defendants' trial in 1998, Seventh Circuit precedent did not require a CCE instruction. *See United States v. Jackson*, 207 F.3d 910, 919 (7th Cir. 2000).

A CCE charge involves a "violat[ion]" of the drug statutes where "such violation is a part of a continuing series of violations." 21 U.S.C. § 848(c). "[A] jury in a federal criminal case brought under § 848 must unanimously agree not only that the defendant committed some 'continuing series of violations' but also that the defendant committed each of the individual 'violations' necessary to make up that 'continuing series.'" *Richardson*, 526 U.S. at 815.

In direct appeals from judgments of conviction in the federal system, "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." FED. R. CRIM. P. 52(a). For all constitutional errors, except those limited fundamental errors which require automatic reversal, *i.e.*, those affecting substantial rights, "reviewing courts must apply Rule 52(a)'s harmless-error analysis and must disregard errors that are harmless 'beyond a reasonable doubt.'" *Neder v. United States*, 527

U.S. 1, 7 (1999) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). The failure to instruct the jury on an essential element of a CCE is harmless error when "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* at 15 (quoting *Chapman*, 386 U.S. at 24).

*Jackson* is a similar case which involved the Gangster Disciples, a street gang operating a widespread drug distribution conspiracy in the Chicago suburbs. 207 F.3d at 913. Twelve Gangster Disciples codefendants argued their CCE convictions should have been reversed because the district court did not give a CCE jury instruction. *Id.* at 919. We found harmless error because the jury had found the defendants guilty of "many more than three predicate offenses relating to the drug conspiracy." *Id.* The same is true here. Colon and Martinez were named in a series of substantive drug counts in the indictment. Aside from the CCE conviction, Colon was convicted of nine counts of using a telephone to facilitate a drug felony and nine counts of distributing cocaine. Martinez, in addition to the CCE conviction, was convicted of five counts of using a telephone to facilitate a drug felony and nine counts of distributing cocaine. The jury unanimously found that both defendants had committed more than three specific predicate offenses, which makes any error in the jury instructions harmless. *See Smith*, 223 F.3d at 568; *see also United States v. Hardin*, 209 F.3d 652, 659 (7th Cir. 2000) (finding harmless error in same circumstances). "[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *Neder*, 527 U.S. at 17.

Martinez additionally argues that his CCE conviction should be reversed because his conviction for the predicate

drug offenses was based solely on coconspirator liability under *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946), which holds that the acts of one person may be attributed to another when there is a conspiracy. *Pinkerton* has been regularly applied to drug conspiracies, primarily through the use of what is known as the *Pinkerton* instruction. *See Smith*, 223 F.3d at 567. The *Pinkerton* instruction, which was given in the instant case, states, "A conspirator is responsible for the acts of any other member of the conspiracy if he was a member of the conspiracy when the act was committed, and if the act was committed in furtherance of or as a natural consequence of the conspiracy."

The court in *Smith* found that the question of whether the actions of others were reasonably foreseeable to a particular defendant is a factual one, and refused to reject *Pinkerton* as a matter of law in a street gang, drug conspiracy case. 223 F.3d at 567. The case in *Smith*, like that of *Jackson*, dealt with the Gangster Disciples street gang. *Id.* at 560. The codefendants in *Smith*, like the codefendants in the instant case, were charged with operation of a drug conspiracy and operation of a CCE, in addition to numerous drug-related charges, including the use of a telephone to facilitate drug crimes. *Id.* at 560-61. Following *Smith*, we also reject the argument that *Pinkerton* liability is unavailable. In any case, Martinez was personally involved in four of the drug distribution counts and five of the telephone counts. His conviction on the CCE count is affirmed.

## C. Martinez's Brief

Although Martinez stated in his "Summary of the Arguments" section that there were "inappropriate additions to the base offense level in violation of *Apprendi* used to determine the criminal history category," his arguments

all focus on the base offense level, not the computations of the criminal history category. Because he has not developed any argument on the criminal history category, that issue is waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991).

Martinez objects to his sentence based on the same issues as Colon, that there were *Apprendi* violations in calculating the drug quantity, that the drug quantity calculation was based on perjured testimony, and that the district court erred in applying the use of a dangerous weapon enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) and a leadership role enhancement in the conspiracy under § 3B1.1(a). Martinez's convictions were for a CCE in violation of 21 U.S.C. § 848 (count 2), use of a telephone to facilitate a drug felony in violation of 21 U.S.C. § 843(b) (counts 6, 8, 9, 13), and distribution of cocaine in violation of 21 U.S.C. § 841 (counts 10-12, 14, 15, 18-21).

Although the district court had determined the amount of drugs involved in the conspiracy was more than 50 kilograms, the judge acknowledged that there was a transaction between Colon and Escobar for five kilograms "that Colon explicitly kept Mr. Martinez out of." Therefore, the court set the base offense level for Martinez at 34, for an amount less than 50 kilograms. *See* U.S.S.G. § 2D1.1(c)(3) ("At least 15 KG but less than 50 KG of Cocaine"). For each count except the CCE, the district court calculated the base offense level at 34 because less than 50 kilograms of cocaine were involved. U.S.S.G. § 2D1.1(c)(2). As we previously discussed, *Apprendi* does not affect the calculation of sentences that fall within the statutory maximum. *See Talbot*, 226 F.3d at 869.

The district court then added a two-level enhancement for the involvement of a dangerous weapon. The judge stated that the evidence showed that guns "would be used

to enforce gang discipline, to facilitate the sale of drugs," and "it is, frankly, not conceivable to me that [Martinez] would have believed that he could exercise his, his [sic] duties as a regional head of the north side without his subordinates using guns or threatening to use guns." The judge also took note of Martinez's personal history, which "shows repeated use of guns on an illegal basis." This last statement was due in part to Martinez's criminal history. He had been convicted of aggravated battery in 1991 when he was involved in a shootout with a rival gang. He was charged with murder in 1987 but pled guilty to voluntary manslaughter with the use of a gun. In 1997, he pled down from felony armed robbery to misdemeanor robbery. In addition, during the search of Martinez's home, agents recovered an empty gun box and ammunition. Escobar stated that he frequently saw both Souffront and Martinez with weapons. There are numerous discussions on the tape-recordings between Colon, Marisol, Escobar, and Martinez about the use of violence and shootings to protect territory, to enforce the collection of drug debts and street taxes, and in disciplining gang members. The district court did not err in applying the dangerous weapon enhancement.

The district court determined that, given the fact that Colon was clearly the leader, Martinez was a manager or supervisor in a conspiracy of five or more participants. The testimony at trial showed that Colon replaced Souffront with Martinez as regional boss. Escobar testified that after the search of Souffront's apartment, Escobar was told by Martinez that Martinez was now the boss. On one tape, Colon told Marisol, "I want everybody to go through [Martinez]. . . . and that's it." A three-level enhancement for Martinez's leadership role was added. *See* U.S.S.G. § 3B1.1(b). The court carefully followed the dictates of the sentencing guidelines in calculating Martinez's base offense level for the non-CCE counts at 39. There was no error.

For the CCE count, the court again began with a base offense level of 34 and added the two-level enhancement for possession of a dangerous weapon, arriving at an offense level of 36. The base offense level for a CCE under § 2D1.5 must be 38 or 4 plus the calculated offense level, which is 36 for Martinez. The district court correctly computed Martinez's base offense level at 40, as required by the guidelines. There was no error.

Martinez also argues the enhancement for a manager/supervisor, in addition to the CCE conviction, results in double-counting. As we previously noted, the district court followed the mandates of the sentencing guidelines, and there was no double-counting.

### III.  CONCLUSION

We find no merit in any of the arguments raised by any of the defendants. For the reasons stated, we AFFIRM the convictions and sentences of all four defendants.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—8-6-03